HENRY L. REICHERT and William G. Ray, Copartners, Doing
Business under the Firm Name and Style of Reichert & Ray,
Respondents, v. NORTHERN PACIFIC RAILWAY COM-
PANY, a Corporation, Appellant.

(167 N. W. 127.)

**Natural water course — court — failure to instruct jury as to — what consti-
tutes — instruction not requested — not reversible error.**

1. Under the facts of the case it was not reversible error to fail to instruct
the jury as to what constituted a natural water course or drainway, no specific
instruction being asked.

**Railway company — natural drainway — embankment constructed across by
company — culvert — outlet — duty to provide — sufficient to carry sur-
plus water off — damages — railway company liable for.**

2. Where a railway company constructs an embankment across a natural
drainway, it is its duty to prepare a culvert or other outlet sufficient for any
flood which may reasonably be anticipated; and where the culvert or outlet is in
fact insufficient for such purposes, the mere fact that competent engineers are
employed or that the embankment is constructed in the manner usually adopted
by railway companies will not save such company from liability.

**Actual facts — opinions of experts — cannot prevail over.**

3. The opinion of experts cannot prevail over actual facts.

**Proof required of plaintiff — preponderance of evidence — facts — jury
passes upon.**

4. A plaintiff is not bound to exclude the possibility that the accident com-
plained of might have happened in some other way than that contended for by
him. He is merely required to satisfy the jury by a fair preponderance of the
evidence of the truth of his contention.

**Ditch or culvert — inadequacy of — property flooded — by reason of — em-
bankment across natural drainway — excessive rainfall — not antici-
pated — burden of proof — jury.**

5. Where property is flooded by the inadequacy of a ditch and culvert through
a railway embankment which is constructed across a natural drainway, the bur-
den of proof to show that the rainfall was so unnatural and unprecedented that
it need not have been anticipated is upon the defendant, and the fact is one pri-
marily for the jury, and not the court, to pass upon.

**Flood — unusual — mere fact of — does not absolve company — ordinary
anticipation — question to determine.**

6. The mere fact that a flood is unusual does not absolve a railway company
from liability if its ditches and culverts constructed through an embankment
across a natural drainway are inadequate to carry off the water and to save

the adjoining property from loss. The question is whether it was beyond ordinary anticipation.

**Railway company — natural water courses — obstruction of — application of law — same rule applies.**

7. The same rule of liability applies in cases of the obstruction of natural water courses and of natural drainways.

**Natural drainway — proof of — topography of the country — climatic conditions — courts must take notice of.**

8. It is not necessary to the proof of a natural drainway that there should be proof of water flowing at all times or of a wearing away of the grass at the bottom. In treeless areas, such as those in North Dakota, the courts must take cognizance of the natural topography of the country and of its climatic condition, and that large volumes of water rush down such drainways in a few days or hours which in wooded areas would form continuous streams and take months to pass away.

**Action in tort — damages — allowance of interest — indiscretion of jury — verdict in excess of ad damnum — presumed to include interest — absence of objection — absence of request to have verdict made more definite.**

9. Where in an action in tort in which, under the provisions of § 7143 of the Compiled Laws of 1913, interest is allowable in the discretion of the jury, and in which the complaint asks for interest and the jury returns a verdict in excess of the ad damnum, but not in excess of the ad damnum and interest thereon, if interest had been allowed, the court will presume, in the absence of any objection at the time of the rendition of the verdict or request to have the same made more definite, that the amount so returned included interest, and the verdict will not, for the reasons given, be set aside.

**Special verdict — argument of counsel on.**

10. Argument by counsel on a special verdict held, under the facts of the case, not to constitute prejudicial or reversible error.

**Requested instructions — refusal of — by trial court — not prejudicial.**

11. The refusal of certain offered instructions held not to have been prejudicial.

Opinion filed September 25, 1917. Rehearing denied March 1, 1918.

Action to recover damages for the flooding of a building.

Appeal from the District Court of Stark County, *W. C. Crawford,* J.

Judgment for plaintiffs. Defendant appeals.

Affirmed.

*Watson, Young, & Conmy,* for appellant.

There is no negligence on the part of defendant proximately causing the loss claimed, shown by the testimony in this case. The plaintiff insists that, without reference to the question of negligence, the defendant is answerable in damages. Such is not the law. Broom, Legal Maxims, 8th ed. 365, and authorities cited; Carroll v. Rye Twp. 13 N. D. 458, 101 N. W. 894.

In building its embankment and in putting in its culvert, defendant was not required to anticipate extraordinary floods or superhuman agencies. Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 24, 37 N. W. 717; Morrissey v. Chicago, B. & Q. R. Co. 38 Neb. 406, 56 N. W. 946; Chicago, R. I. & P. R. Co. v. Shaw, 63 Neb. 380, 56 L.R.A. 341, 88 N. W. 510; Gulf, C. & S. F. R. Co. v. Huffman, — Tex. Civ. App. —, 81 S. W. 537; Berninger v. Sunbury, H. & W. R. Co. 203 Pa. 516, 53 Atl. 361; Bellinger v. New York C. R. Co. 23 N. Y. 49; Cleveland, C. C. & St. L. R. Co. v. Wisehart, 161 Ind. 208, 67 N. E. 993; Harris v. Lincoln & N. W. R. Co. 91 Neb. 755, 137 N. W. 865; Wallace v. Columbia & G. R. Co. 34 S. C. 62, 12 S. E. 815; Chicago, B. & Q. R. Co. v. Schaffer, 26 Ill. App. 280.

Assuming that the proof offered by the plaintiffs here, tending to show inadequacy of the culvert, would be sufficient to sustain a finding of the jury to that effect, we contend that the other testimony in the case clearly disproves any such contention. Soules v. Northern P. R. Co. L.R.A.1917A, 501, 157 N. W. 823.

The undisputed testimony shows that the loss here might just as well have been occasioned by causes for which this defendant cannot be held responsible. The evidence shows that the defendant's culvert was blocked by a city crossing floating over it, and the flood and consequent loss were caused by this condition, and not by the inadequacy of the culvert. Meehan v. Great Northern R. Co. 13 N. D. 443, 101 N. W. 183; Garraghty v. Hartstein, 26 N. D. 148, 143 N. W. 390; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305, 14 Am. Neg. Rep. 615; Andrews v. Kinsel, 114 Ga. 390, 88 Am. St. Rep. 25, 40 S. E. 300; Wm. Tackaberry Co. v. Simmons Warehouse Co. 170 Iowa, 203, 152 N. W. 785; Berninger v. Sunbury, H. & W. R. Co. 203 Pa. 516, 53 Atl. 361.

It is mere speculation for the jury to say that an insufficient culvert

was the proximate cause of the flood and loss. Atlantic Coast Line R. Co. v. Woolfolk, 189 Ala. 253, 66 So. 464; Sentman v. Baltimore & O. R. Co. 78 Md. 222, 27 Atl. 1074; Treichel v. Great Northern R. Co. 80 Minn. 96, 82 N. W. 1110; Garraghty v. Hartstein, 26 N. D. 148, 143 N. W. 390.

The excessive rains and storms which came were unusual and extraordinary, and could not have been anticipated within reason, and need not have been provided for. Soules v. Northern P. R. Co. supra; Wm. Tackaberry Co. v. Simmons Warehouse Co. 170 Iowa, 203, 152 N. W. 779; Kansas City, M. & B. R. Co. v. Smith, 72 Miss. 677, 27 L.R.A. 762, 48 Am. St. Rep. 579, 17 So. 81.

"Freshets are regarded as ordinary which are well known to occur in the stream occasionally through a period of years, although at no regular intervals."

The storms, rain, and flood here were unusual and very extraordinary, and could not, in reason or from precedent, have been anticipated. Gould, Waters, 2d ed. § 211; Dorman v. Ames, 12 Minn. 451, Gil. 347; Berninger v. Sunbury, H. & W. R. Co. 203 Pa. 516, 53 Atl. 361; Ætna Mill & Elevator Co. v. Atchison, T. & S. F. R. Co. 89 Kan. 38, 130 Pac. 686; Louisville & N. R. Co. v. Conn, 166 Ky. 327, 179 S. W. 195; American Locomotive Co. v. Hoffman, 105 Iowa, 343, 6 L.R.A. (N.S.) 252, 54 S. E. 25, 8 Ann. Cas. 773; Sentman v. Baltimore & O. R. Co. 78 Md. 222, 27 Atl. 1074; Greiner v. Alfred Struck Co. 161 Ky. 793, 171 S. W. 405; Ilfrey v. Sabine & E. T. R. Co. 76 Tex. 63, 13 S. W. 165.

A special verdict must cover all the issues in the case, including those admitted in the pleadings or undisputed in the testimony. Elliott v. Miller, 158 Fed. 868; Harbaugh v. People, 33 Mich. 241.

The special verdict here returned does not include and cover all the issues, and therefore the judgment entered on it cannot stand. Hodges v. Easton, 106 U. S. 408, 27 L. ed. 169, 1 Sup. Ct. Rep. 307; Elliott v. Miller, supra; Standard Sewing Mach. Co. v. Royal Ins. Co. 201 Pa. 645, 51 Atl. 354.

The finding of the jury in the special verdict on the amount of damages is not sustained by the pleadings or the instructions of the court, and will not sustain any judgment. Johnson v. Northern P. R. Co. 1 N. D. 354, 48 N. W. 227.

If the jury intended to allow interest the verdict should have so found and so definitely stated. Fiore v. Ladd, 29 Or. 528, 46 Pac. 145; Cookville Coal & Lumber Co. v. Evans, — Tex. Civ. App. —, 135 S. W. 750; Morrissey v. Morrissey, 180 Mass. 480, 62 N. E. 972.

Plaintiffs waived the right to interest by failing to request instructions thereon. Parsons v. Jameson, 70 N. H. 625, 46 Atl. 687; Hesse v. Zaffke, 183 Ill. App. 160.

The argument of counsel before the jury on a special verdict is limited to such verdict, and counsel has no right to argue generally. Morrison v. Lee, 13 N. D. 599, 102 N. W. 223.

The sole purpose of a special verdict is to submit to the jury certain questions which they are required to answer, without any knowledge of the effect of their answers. Ward v. Chicago, M. & St. P. R. Co. 102 Wis. 215, 78 N. W. 442; Morrison v. Lee, supra; Guild v. More, 32 N. D. 476, 155 N. W. 44; Snider v. Washington Water Power Co. 66 Wash. 598, 120 Pac. 88.

On special verdicts the court should instruct intelligently on the issues so presented. One of the points in issue was as to the unusual character of the storm. This was not touched upon. Lathrop v. Fargo-Moorhead Street R. Co. 23 N. D. 246, 136 N. W. 88; Ohio & M. R. Co. v. Thillman, 143 Ill. 127, 56 Am. St. Rep. 359, 32 N. E. 529; Kansas City, M. & B. R. Co. v. Smith, 72 Miss. 677, 27 L.R.A. 762, 48 Am. St. Rep. 579, 17 So. 81; Eagan v. Central Vermont R. Co. 81 Vt. 141, 16 L.R.A.(N.S.) 928, 130 Am. St. Rep. 1031, 69 Atl. 732; Pittsburg, Ft. W. & C. R. Co. v. Gilleland, 56 Pa. 445, 94 Am. Dec. 98.

This instruction should have been given without request. It covers an issue in the case. Rev. Codes 1905, § 7021, Comp. Laws 1913, § 7620; Putnam v. Prouty, 24 N. D. 530, 140 N. W. 93; Forzen v. Hurd, 20 N. D. 43, 126 N. W. 224.

Damages suffered by plaintiff from surface water diverted by highways is not traceable to any misconduct on the part of defendant. Carroll v. Rye Twp. 13 N. D. 458, 101 N. W. 894; Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 22, 37 N. W. 717; Moore v. Booker, 4 N. D. 543, 62 N. W. 607; McPherrin v. Jones, 5 N. D. 261, 65 N. W. 685.

*Martha & Sturgeon* and *Thomas Pugh,* for respondent.

There was sufficient proof of negligence to go to the jury. The defendant should have known that the culvert built was entirely insuf-

ficient. The failure to provide for the run-off of such water as might reasonably be expected to come down the drainage was negligence for which defendant is answerable. Soules v. Northern P. R. Co. 34 N. D. 7, L.R.A.1917A, 501, 157 N. W. 823.

Building the embankment and culvert in most approved manner does not excuse defendant if the flowage is insufficient. Fremont, E. & M. Valley R. Co. v. Harlin, 50 Neb. 698, 36 L.R.A. 417, 61 Am. St. Rep. 578, 70 N. W. 263, 1 Am. Neg. Rep. 312; Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811.

The testimony of expert engineers to the effect that the railway culvert was sufficient does not control over actual facts. The jury was not bound to accept the opinions of defendant's experts. 17 Cyc. 131, 262, 269, 276, et seq.; 5 Enc. Ev. 643; Laughlin v. Street R. Co. 62 Mich. 220, 28 N. W. 873; Jones, Ev. ¶ 390, p. 491; Hull v. St. Louis, 42 L.R.A. 762, note; Potter v. Grand Trunk Western R. Co. 157 Mich. 216, 22 L.R.A.(N.S.) 1039, 121 N. W. 808; Com. v. Leach, 156 Mass. 99, 30 N. E. 163; 8 Decen. Dig. Evidence, ¶ 574.

The defendant should have provided for the run-off of all water that might reasonably be expected, and this is a continuing duty. Soules v. Northern P. R. Co. supra.

The court need not submit to the jury questions admitted in the pleadings or upon which there is no dispute. Lathrop v. Fargo-Moorhead Street R. Co. 23 N. D. 246, 136 N. W. 88; State v. Hanner, 24 L.R.A.(N.S.) 35, note.

It is wholly immaterial whether or not defendant employed competent engineers. Hitchins Bros. v. Frostburg, 68 Md. 113, 6 Am. St. Rep. 422, 11 Atl. 826.

The test of liability is not the fitness of the engineer, but the efficiency of the work. Lion v. Baltimore City Pass. R. Co., 90 Md. 266, 47 L.R.A. 127, 44 Atl. 1045; Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811.

Objections to the argument of counsel upon a special verdict come too late after counsel has closed. If objectionable argument or statements are made by counsel, the opposing counsel should enter his objections at the time, and should be specific in pointing out wherein the argument is objectionable, in order to give court and counsel an opportunity to correct any such error if error was made. Snider v. Wash-

ington Water Power Co. 66 Wash. 598, 120 Pac. 88; 38 Cyc. 1507, (1) 1509, J.; Columbia & P. S. R. Co. v. Hawthorne, 3 Wash. Terr. 353, 19 Pac. 25; West Chicago Street R. Co. v. Annis, 165 Ill. 475, 46 N. E. 264.

BRUCE, Ch. J. This is an action to recover damages for an injury to the basement of a hotel and a stock of cigars and other articles contained therein by the obstruction and throwing back of storm waters.

The complaint alleges generally "that upon said right of way, on said date and for a long time prior thereto, the defendant maintained a high grade or embankment of earth rising several feet above the level of the surrounding surface of the land; . . . that said grade or embankment crossed a natural water course; . . . that said water course had a well-defined bed and banks, and a stream of water flowing through said water course; that said water course and the bed thereof is the natural drainage for surface and storm waters for a large part of the city of Dickinson and surrounding territory; . . . that the defendant company in constructing said embankment . . . carelessly and negligently entirely filled up and destroyed said water course and channel of drainage, and in the place and stead thereof put through its embankment, part way, a small crooked open ditch and the other part of the way a small iron culvert connecting with said ditch, which said ditch and culvert were entirely insufficient in size and fall to carry off the waters of said water course or storm water of said drainage area or basin in times of rain, and were so carelessly and negligently constructed and maintained that they entirely failed to carry off said waters; that, because of the negligent construction and maintenance of said embankment, the negligent construction and maintenance of said ditch and culvert, and the lack of size, fall, and capacity of said ditch and culvert, on July 28, 1914, storm waters dammed up against said embankment and flowed over and upon the hereinbefore described premises of the plaintiffs, and into said basements," etc.

The answer is a general denial to which is added the further defense "that the damage and injury suffered by the plaintiffs herein were occasioned and caused by an unusual and unprecedented storm and flood."

The injury complained of was the result of the same storm which

was considered by this court in the case of Soules v. Northern P. R. Co. 34 N. D. 7, L.R.A.1917A, 501, 157 N. W. 823, the hotel of the plaintiff being situated on Villard street and just one block west of the property damaged and under consideration in the prior action. With the exception of that part which pertains to the property injured and the value thereof, the evidence is very similar. Though, therefore, we will seek to point out and to consider the points in which a difference occurs, we will not retail all of the evidence, but will satisfy ourselves by referring generally to the prior decision.

In the case of Soules v. Northern P. R. Co. supra, we found that the jury was justified in holding, and the special verdict in the case at bar also finds, that the swale or ravine down which the waters ran was a natural drainway. In the present case, however, it is contended that the court erred in not instructing the jury as to what, under the law, constitutes such a drainway or water course.

There is no merit in this contention. It would seem generally that a jury of intelligent men is fully competent, without instructions upon the subject, to decide what a natural water course or a natural drainway is. In any event the error, if error at all, was one of nondirection, and not misdirection; and the defendant, if he desired a specific instruction upon the subject, should have asked for one. Buchanan v. Occident Elevator Co. 33 N. D. 346, 15 N. W. 122; Halverson v. Lasell, 33 N. D. 613, 157 N. W. 682; McGregor v. Great Northern R. Co. 31 N. D. 471, 154 N. W. 261, Ann. Cas. 1917E, 141.

It is next contended by counsel for the defendant that the plaintiff put no expert engineers on the stand, and that the engineers of the defendant testified that the culvert was constructed according to approved methods, and by competent engineers, and in such a manner as is usually adopted by railway companies. He argues from this that no negligence is shown on the part of the defendant railway company; and that, therefore, no recovery can be had.

We are satisfied, however, that, provided the ravine or swale is a natural drainway, building an embankment or culvert in the most approved manner does not excuse the defendant in a case such as that which is before us, provided that the provision for the flowage is actually insufficient and that the flowage of which the defendant had reasonable warning was not provided for. Freemont, E. & M. Valley

R. Co. v. Harlin, 50 Neb. 698, 36 L.R.A. 417, 61 Am. St. Rep. 578, 70 N. W. 263, 1 Am. Neg. Rep. 312; Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811; Skinner v. Great Northern R. Co. 129 Minn. 113, 151 N. W. 968; Lion v. Baltimore City Pass. R. Co. 90 Md. 266, 47 L.R.A. 127, 44 Atl. 1045; Hitchins Bros. v. Frostburg, 68 Md. 113, 6 Am. St. Rep. 422, 11 Atl. 826.

It is true that in the cases of Carroll v. Rye Twp. 13 N. D. 458, 101 N. W. 894, and Hannaher v. St. Paul, M. & M. R. Co. 5 Dak. 23, 24, 37 N. W. 717, we seem to have held that actual negligence in construction was necessary to be proved. These cases, however, relate to surface waters merely, and not to waters which flow in a natural channel, and the case of Carroll v. Rye Twp. was one in which a municipal corporation was involved and where the strict rule of liability does not apply.

In the case of Hannaher v. St. Paul, M. & M. R. Co. supra, the opinion largely, if not entirely, turned upon the fact that the plaintiff had deeded to the railway company its right of way. The court held that the same rule applied in such cases as if the right of way had been condemned, and that the property owner would be presumed to have been awarded damages, and that the consideration of his deed would be presumed to have been based upon the injury which would naturally and probably follow from the construction of the railroad in the ordinary and usual manner.

In the case at bar there is no proof of any such grant or of any such deed, nor that any compensation was made to the plaintiffs at any time on account of the construction of the railroad. It is also fair to add that the decision in the Hannaher Case was handed down in 1888, and before the adoption of the North Dakota Constitution; and that the Federal Constitution, which then alone prevailed and was operative in North Dakota, merely provided that property should not be *taken* for a public use without compensation. The Constitution of North Dakota now provides that property shall not be taken or *damaged,* etc.

In the case of Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811, also cited by counsel for appellant, the court, among other things, said: "The duty of the railroad company in constructing its road when it crosses a stream is to provide a passageway for the water reasonably sufficient to allow it to flow through without being

backed up so as to cause damage to property. . . . It is not bound to provide for unprecedented floods, but must anticipate and make provision for such floods *as may occur in the ordinary course of nature.* It must foresee and *provide* for *unusual storms, such as occasionally occur, whether they* be called *ordinary or extraordinary.* . . . But the railroad company is not guilty of negligence in failing to provide for a flood which is not only extraordinary, but unprecedented, *and could not reasonably have been foreseen.* . . . There was evidence that the flood which resulted in the damage in question was due to a heavy, but not unprecedented, rainfall; and therefore the verdict must be sustained, unless there was error in the admission of evidence or in the instructions of the court. Defendant introduced evidence that, in the construction of the culvert in question, it acted upon the advice of competent and skilful engineers, and asked instructions to the effect that, having done so, it was not responsible for any damage due to insufficiency of the culvert. *But this is not the rule governing the liability of railroad companies in such cases.* The engineers whose judgment was relied on in the construction of the culvert were the servants of the defendant, and it will be liable for any lack of skill or of proper judgment in the particular case, no matter what their general skill or competency may have been. *It was their duty, as servants of the defendant, to prepare a culvert sufficient for any flood not extraordinary and unprecedented.* The instructions of the court as to this matter were as favorable to appellant as it had a right to ask. It is not the danger which a competent and skilful engineer does in fact anticipate, but that which, in the reasonable exercise of his skill, he ought to have anticipated, which the company is bound to provide for. Baltimore & O. R. Co. v. Sulphur Spring Independent School Dist. 96 Pa. 65, 42 Am. Rep. 529; Libby v. Maine C. R. Co. 85 Me. 34, 20 L.R.A. 812, 26 Atl. 943. Counsel for appellant, however, rely upon cases holding that a city is not liable for damage to property from flooding by water resulting from the improvement of streets, the construction of sewers, etc., where the city council has in good faith adopted and followed the plans of competent engineers. Van Pelt v. Davenport, 42 Iowa, 308, 20 Am. Rep. 622; Hoehl v. Muscatine, 57 Iowa, 444, 10 N. W. 830. *But these cases are predicated on the view that, in the exercise of its general duty to make public improvements, the*

*municipal corporation will not be chargeable with negligence, if, in acting, as it must, through the agency of others,* it selects a competent agent to perform the duty required of it.    Van Pelt v. Davenport, supra.    No such principle is applicable to *a private corporation chargeable with* no duty to make an improvement, and doing so for its own special benefit.    The authorities relating to the immunity of municipal corporations, where a plan prepared by a competent engineer has been adopted in good faith and in the belief that it is sufficient, as well as those limiting the application of the doctrine, are collected in an article in 51 Cent. L. J. 185, but they need not be further discussed.    *Our attention is not called to any case in which the doctrine* is extended to the case of a railway or other private corporation."    This case certainly is not an authority for the defendant.

We have also carefully examined the other cases cited by counsel for appellant.    The case of Morrissey v. Chicago, B. & Q. R. Co. 38 Neb. 406, 56 N. W. 946, 57 N. W. 522, related to surface waters merely.

The case of Chicago, R. I. & P. R. Co. v. Shaw, 63 Neb. 380, 56 L.R.A. 341, 88 N. W. 508, although cited by counsel for the appellant, is also in fact an authority for the rule which we announce.    Although, indeed, it contains other general language, it specifically says:    "In Town v. Missouri P. R. Co. 50 Neb. 768, 70 N. W. 402, 1 Am. Neg. Rep. 631, it is said: 'Surface water may have such an accustomed flow as to have formed at a *certain place a channel or course, cut in the soil by* the action of the water, *with well-defined banks,* and having many of the distinctive attributes *of a water course;* and though there are no exceptions to the general rule, *except from necessity, this may constitute an exception,* and, if the flow is stopped by the erection of an embankment across and in the channel, some provision may be necessary for the allowance of the regular flow of the surface waters. Whether such embankment has been negligently constructed with reference to the obstruction of the flow of the surface waters, and whether such negligence, *if any, is the proximate cause* of an alleged injury, *are generally questions to be submitted to the jury.'*    We think that the case last cited from is decisive of the one at bar, and we fully agree with the reasoning of that case.    *It would be an unfortunate rule of law which would allow a railroad company, or any other proprietor of land, to erect an embankment across a ravine in which a large body of water is*

*accustomed to run during the rainy season or upon the melting of snow,* without making the necessary provision for its flow in the usual manner. In the present case there was a ravine of some miles in length, *down which the water poured in large quantities at certain seasons.* It was fed by other like draws and streams. The fact that it cut its way through the solid embankment on different occasions is evidence sufficient to show the volume and force of the water which it carried. It might, almost as a matter of law, be said to be *negligence to throw an embankment across a ravine without providing adequate means for the flow of the water,* and it certainly ought not to be contended that the *finding of the jury* that such an act *was negligence* ought to be disturbed by the court. *We regard it as now settled by the former decisions of this court that a railway company, or other proprietor of land, cannot throw an embankment across a ravine or draw, into and through which the surface water of a large scope of country is accustomed to flow, without providing adequate means for the usual flowage of the water naturally seeking an outlet.* We think the court was fully justified in giving its eighth instruction by the cases above quoted, and that error cannot be predicated thereon."

We cannot see the applicability of the case of Gulf, C. & S. F. R. Co. v. Huffman, — Tex. Civ. App. —, 81 S. W. 537.

The case of Wallace v. Columbia & G. R. Co. 34 S. C. 62, 12 S. E. 815, turned on the construction of the complaint, and holds that such complaint announced conclusions of law, rather than issues of fact.

The case of Berninger v. Sunbury, H. & W. R. Co. 203 Pa. 516, 53 Atl. 361, turned on the proposition that the flood or ice gorge was extraordinary and unprecedented.

In the case of Cleveland, C. C. & St. L. R. Co. v. Wisehart, 161 Ind. 208, 67 N. E. 993, the negligence complained of was the fact that the railroad company, while constructing its railroad bridge, caused dirt to fall into a ditch or waterway which it had constructed so as to prevent the water of the plaintiff from flowing into the river. It was on this ground that the decision was rendered and that the court used the language, elsewhere cited by counsel for appellant, that "it is certainly elementary that no action can arise from the doing of a lawful act in a lawful manner, and unless it is done in an unlawful, wrongful, or negligent manner; and, wherever the act complained of is or may be in itself

lawful, in order to constitute a good cause of action based thereon, the complaint must aver that the lawful act was unlawfully done, wrongfully, negligently, or carelessly."

The opinion in fact took pains to state that the complaint alleged negligence while constructing the bridge, and not in obstructing the stream after the bridge had been erected. Whether the distinction is a good one or not, we are not prepared to say. We do say, however, that the case is not an authority in the action which is before us.

The case of Harris v. Lincoln & N. W. R. Co. 91 Neb. 755, 137 N. W. 865, simply turned on the point that the evidence did not show that the injury had been occasioned by the railway company.

The case of Chicago, B. & Q. R. Co. v. Shaffer, 26 Ill. App. 280, seems to be in no way applicable. It does, however, hold, and this will be for the benefit of the plaintiff rather than of the defendant, that the question as to whether the storm was extraordinary was one for the jury to pass upon.

Counsel, however, cites the case of Bellinger v. New York C. R. Co. 23 N. Y. 42–46, and urges that a railway company in constructing a railroad acts under authority of law and cannot be held liable except for positive negligence, and then only for damages which accrue and for the immediate results thereof.

The case, however, referred to, is practically the only one cited by counsel which supports this proposition, and it is faulty in two respects. Its premise that a railroad corporation is an agency of the state is not correct, nor was the Constitution of New York at the time of this decision similar to our own.

"A railroad, although acting under an authority derived from the state, does not act, properly speaking, in behalf of the state, or as its agent or representative" in this respect, and is not similar to a municipal corporation which constructs highways for and under the authority of the parent state. See 23 Am. & Eng. Enc. Law, 2d ed. 676; Bradley v. New York & N. H. R. Co. 21 Conn. 306; Houghtaling v. Chicago G. W. R. Co. 117 Iowa, 540, 91 N. W. 811.

In New York also, at the time of the handing down of the decision referred to, the Constitution merely provided that "no property shall be *taken* for a public use without just compensation being made." The Constitution of North Dakota, however, provides that "no property shall

be taken *or damaged* for a public use without compensation being made." This difference in the Constitutions is very important and has radically altered the tenor of the decisions. Gram Constr. Co. v. Minneapolis, St. P. & S. Ste. M. R. Co. 36 N. D. 164, 161 N. W. 732.

The general rule, indeed, appears to be that, "though a man do a lawful thing, yet if any damage thereby befalls another he shall be answerable if he could have avoided it. So use your own property as not to injure the rights of another is a very general application in cases of conflicting interest, and, it has been observed, will generally serve as a clue to the labyrinth in such cases." Broom, Legal Maxims, 357 et seq.; People's Ice Co. v. The Excelsior, 44 Mich. 229, 38 Am. Rep. 246, 6 N. W. 636.

It is next contended by counsel for appellant that there is no testimony to show any inadequacy or defect in the culvert which proximately caused the loss in question. He contends that the plaintiffs offered no testimony showing any negligence either in the construction of the railway embankment or in the size of the culvert maintained. He contends that it affirmatively appeared without contradiction, that the embankment and roadbed were constructed properly and in the ordinary and usual manner; that plaintiffs offered no proof by engineers or otherwise showing the insufficiency of the culvert under the tracks; and that they contented themselves merely with offering testimony that on July 28, 1914, the culvert ran full. He contends that they did not show that at the time of the loss the culvert was running over, but rather, and on the other hand, that the railway company showed without contradiction that the culvert was completely obstructed by a wooden crossing getting over its mouth. He contends that proof even of the culvert running full is not proof of its insufficiency. He also contends that under plaintiffs' proof no negligence is shown, and that there is simply a showing that possibly the railway embankment and the culvert helped in the obstruction and holding back of the waters. He maintains that the testimony in the present case differs somewhat from that produced in the case of Soules v. Northern P. R. Co. 34 N. D. 7, L.R.A.1917A, 501, 157 N. W. 834. He maintains that in the case at bar the record shows that the storm started at about 12 o'clock in the evening of the 27th day of July, 1914; that the worst part was over about 4 o'clock on the 28th, although it rained somewhat

between then and 6 o'clock; that up to 6 o'clock A. M. on the morning of
July 28, 1914, 2½ inches of rain fell; that the water stopped running
into the hotel at about 4 o'clock A. M.; that the engineers, Taylor,
Atkinson, and Burt, all testified that the culvert in question would
handle a rainfall of 2½ inches if it all came down in fifteen minutes;
that these men testified to a knowledge of the drainage basin in ques-
tion, its soil, and of everything else which might be necessary for them
to have in order to give an intelligent opinion, and were entirely
familiar with the area of the basin, its grade, the approximate area
covered by houses and business blocks, the approximate area covered
by streets and sidewalks, and the general situation therein; that they
all agree that the formula and the variables used by the engineer con-
structing the culvert (Berkli-Zeigler formula) and the variables used
in determining the run-off were the proper ones to be used, and that
such formula was given an actual test in connection with the partic-
ular basin and found to be accurate.   He also contends that on a prior
occasion and on June 26, 1915, it rained 1.16 inches in one and one-
half hours; that this amount was above the average, and that during
this rain, although the water came up over the sidewalk in front of
Soules & Butler's store and within 5 feet of their building, still the
culvert never at any time was forced to more than one third of its
capacity; that under such circumstances, and the culvert in such a con-
dition, the water would only have had to rise .15 of a foot or about 2
inches to get into Soules & Butler's basement; that during this storm
the elevation of the water was much greater around Soules & Butler's
property than at the mouth of the culvert,—99.15 inches at Soules &
Butler's, and only 96.3 inches at the culvert.   He also maintains that
the engineers of the defendant railway company accounted for this
high level of the water to the west and north of the culvert during the
storm on June 26, 1915, and on July 28, 1914, which is the storm in
controversy in the present lawsuit, on the ground or theory of the pil-
ing up of the waters because of the intersecting city streets and the
comparatively level ground of the portion of the basin just to the north
and west of the culvert, which they claim prevented the water from
flowing away as fast as it came down the outlying slopes.   This test,
he claims, proves three things:   (1) That the culvert was wholly
adequate and the formula and variables used by the engineers proper

in all respects; (2) that the flooding around Soules & Butler's property at previous times was caused by the natural formation of the watershed and the inadequate city culverts; and (3) that the flood of July 28, 1914, was caused by the culvert being blocked. He does not contend that on July 28, 1914, the culvert was not covered with water, but he does contend that the reason it was covered was because it was prevented from doing its work on account of the city crossing being over its mouth. In this connection he emphasizes a fact, which he claims to have been established,—that the high-water elevations taken by the railroad engineers show that the water on July 28, 1914, was higher at the St. Charles Hotel (property of the plaintiffs) than at the mouth of the culvert, and that this is accounted for because of the piling up of the waters, the streets intersecting at right angles, and the level ground in the basin. He maintains that the evidence shows that the culvert could handle a rainfall of 4 inches in one hour's time and a rainfall of $2\frac{1}{2}$ inches if it all came in a period of fifteen minutes.

It was not necessary, however, that the jury should have been controlled by the opinions of the expert witnesses, provided that they were satisfied that the ditch and culvert were actually inadequate, and that the storm or flood was not so unprecedented that it should have been anticipated, and provided that they found and had reason to find that the ravine or water course was a natural drainway. No opinion of an expert can prevail over actual facts. Laughlin v. Street R. Co. 62 Mich. 220, 28 N. W. 873; 17 Cyc. 131; Jones, Ev. § 390, p. 491; 5 Enc. Ev. 643.

"I am of opinion," says the supreme court of New York in Bellinger v. New York C. R. Co. 23 N. Y. 42–46, "though not without some hesitation, that there was evidence enough to submit the case to the jury upon the question whether the road and its embankments and bridges were constructed with suitable care and skill. There was no evidence directly bearing upon the point, by any witnesses of competent knowledge and experience. But the fact that, on three several occasions between the time of the construction of the road, in 1835, to the trial, in 1856, the water and ice had been forced out of the stream upon the plaintiff's land; and that, in the judgment of witnesses who had seen the breaking up of the ice, the diversion of the flood from its natural course on the west side, where it would have been harmless, to

the creek and on to the land on the other side, was caused by the embankment, and the want of sufficient apertures for the passage of the water afforded some evidence that the structures referred to were faulty. When the character of the stream, the peculiar suddenness and violence of the freshets which caused the injury, and their infrequency, are taken into consideration, it is evident that the plaintiff's case was not a strong one; but I think it was to be determined by the jury. I am, therefore, in favor of sustaining the ruling of the court in denying the motion for a nonsuit."

In the case at bar there was at least some evidence to show, and from which the jury might find, that the culvert and ditch were inadequate, and that the defendant had a prior notice and warning of the fact, and that the flooding of plaintiff's property was occasioned by this fact. The trial court was therefore justified in submitting the question to the jury.

James G. Kittleson testified that he had worked for Soules & Butler, whose property is only about a block distant from that of the plaintiff's, since 1907 with the exception of about six months; that he remembered the storm of July 28, 1914; that the present culvert of the railway company was put in in 1919; that *he had seen the culvert fill up a good many times and in different years;* that after the culvert would fill up the water would come up on the sidewalk and keep crawling west on Villard street until sometimes it looked as though that store was going to be crowded over; that they had to pile sacks in front of the store, build a dam in front of the store to keep it from going in; that the water would later recede; that there was nothing to stop the water, but the culvert wasn't large enough he supposed; that nothing ever blocked the mouth of the culvert that he ever saw; since the culvert was put in and before the flood of the 28th day of July, 1914, the water filled up over the culvert two and three and perhaps four times a year; that they had two right in succession there in 1914.

Q. Before this flood, before the middle of July?

A. Well, one Sunday. I couldn't say, but it was before this one of July 28th, perhaps a week or maybe two weeks, I don't remember now: I know there was baseball over at the ball park that Sunday. I wasn't there in July, 1914, but the culvert must have been running full. I don't know whether it was at the time I saw this culvert running full.

The water was over the grade over Villard street and up on the side-walk. There is a city culvert right by the corner of lot 7 and 8 and the city culvert is about half as large as the railway culvert. The city culvert was perhaps 2 feet under water. If the city culvert wouldn't fill there would be no danger of the other one. I don't know anything about the size of the new culvert, between 3 and 4 feet in diameter. I don't know anything about the amount of water it will accommodate when running full, or the contents that goes through there in a certain length of time. When I testified that the culvert was running full I couldn't see the culvert. I saw the water couldn't run through fast enough to accommodate it. I *couldn't see the culvert; it was under water*. I know the culvert was running full because the water in the lulls would go down perhaps as much as 50 feet down Villard street from the store and recede down as far perhaps as lot 7, and if a little rain came it would come right up. I know that culvert was doing its work as much as it could, or else it would not recede and come back again. It stands to reason it was doing its work, as much as it could. The culvert was under water.

Q. Have you seen the culvert running full since the year 1908?

A. I haven't seen the culvert, but I know the culvert has been running full each year. 1909, I think the culvert was put in there, because in 1908 it was flooded out before and they thought they fixed it. In 1908 we flooded out once before,—flooded our basement. That was before this culvert was put in.

Q. Did it flood in 1910, 1911, and 1912?

A. Well each year as I remember it, each year we have those rains so that it always comes up there on the sidewalk. If it comes in in the night, you can see where the water has been up in the lumber yard, and on the store, and on the sidewalk. It leaves a mud trace. I never saw anybody go down to clean the culvert out. I saw some fellows stand up on the track and try to pole some rubbish away once. When the water would get high the culvert would go out of sight under the water.

James Soules testified that he occupied the corner, lot 7, in block 5, for eleven years; that he was about his place of business nearly every day; that during the last five or six years the culvert failed to carry off the water after a rain; that on July 28, 1914, it failed; and

then it failed the other time when we were flooded out there. I don't know what that date was now, I forget, but it was before that; that it had blocked up as far as the lumber office; that on these occasions the water would get deeper to the south and east of the lumber office. It would back up from that way.

Q. What held it on the south side?

A. As we always viewed it, it couldn't get through there.

Q. What kept it from running off in some other direction?

A. This lower place. Across this low place there is an open ditch, —a culvert. The culvert goes under the railroad. My lumber office is on lot 7, block 5. That would be the corner of Villard and Second avenue.

Q. On how many occasions would you say during the four years prior to July, 1914, high water came up as far as your lumber office?

A. Oh, it has been up there lots of times, probably half a dozen or over. Several times it got up as far as my hardware store. On two or three occasions we had to take sacks to keep it from running in on the floor, filled them with dirt and stuff. It came up to my property line and I kept it back, kept it out of the cellar, by damming it back. As far as I know the culvert was dammed up. I don't know of it being blocked up, I cannot say that I do. The water was subsided after these floods. I don't think anybody went down there to clean it out. It was probably in 1911 that the water came into the basement of my building. It was in the summer during the rainy season here. At other times water threatened to come into my basement during times of rain. I probably have been to the culvert. Whether it was running full or whether it was blocked up I cannot just recollect. I was there several times. I was there the last time of course. I cannot recollect that I went down there to see whether that culvert was running full at the time the water was in my basement. There is a ditch running along the west side of Second avenue, running down towards this culvert put in by the city, and there is one runs along First street, runs west. No, the ditch runs over here, angling across and then this ditch runs directly east and then straight across.

Q. You don't understand me. This ditch runs north up Second street, does it not?

A. Yes, sir. And then runs west along First street over to Sims

street, probably 3 or 4 feet deep. There is a culvert here on Villard street, where Second avenue and Villard street meet. It has not the capacity of the railroad culvert.

William G. Ray testified that he had lived in Dickinson for thirty-two years; that when he came to Dickinson there was a bridge; that the railroad grade went through the town just where it is now; that the bridge appeared to be in the low spot, and he supposed the culvert was in the low spot. The culvert is where the bridge used to be; that the part of the town where the St. Charles Hotel is located drained off towards the east and through the bridge; that he thought the whole plat of Dickinson, all the hills and everything, practically graded down that way through the bridge; that the bridge was over a kind of ravine that was graded into the river, not graded by men, but natural; that the water from this ravine ran south into the Heart river; that the Heart river is probably about 400 feet from Villard street; that the ravine extended down north a short distance across Villard street and then it was all level country; that it was a kind of a basin; that it all emptied through that way; that when he came to the country it was what you would probably call a dry run. There was no water there except after a rain, and in the spring of the year the water went through this very fast. It drained quite a lot of territory. Of course, it had worn a small channel right under the bridge, the deepest part, and in the river, and the other way to Villard street. Across the street on the east side was high and the water came all from the west, and the bank on the east side all along there was rather high. It kind of slanted up about 10 or 12 feet, a pretty steep raise. The west bank slanted off very gradually; probably a couple of feet raise. The bottom of the channel at the bridge was about 5 or 6 feet wide.

Q. At Villard street?

A. Well, it got a little smaller as it went up. The bottom of the channel was dirt, I suppose, gravel, whatever it was. I think the grass had been washed away. At the time I am speaking of, Villard street had not been plowed or graded or worked. High water after a rain ran in considerable volume through this channel. There was no other place or way for the water to get away except through this bridge. Now, the water flowing around the St. Charles Hotel goes through this culvert.

On the 28th day of July, 1914, there was a basement under my hotel. In the early morning the water commenced to get into the basement. I went down to the hotel at about 2 in the morning. It had been raining prior to the time when I went down. It had started raining about 1 o'clock. It was raining little showers when I came down to the hotel. When I got to the hotel there was about 3 feet of water in the basement, and it was still coming in; running right over the front sidewalk. The main floor of the hotel is above the street. The new part is about 6 inches above and the old part about 3 feet. The basement windows come up to the sidewalk. If water came over the sidewalk there would not be anything to prevent it from running into the windows. If water came running up over the sidewalk there was nothing to prevent it running down the stairways. The windows held the water out for a while, but the pressure got so strong against them they just broke, and the water went right through. The water got about 7 feet in the basement. I stayed there until about 5 o'clock. The water stopped running in when I left. The water came from the east. The water naturally drains off from my place from the west; that is, the water ordinarily runs east from my place, and this night the water was backing up from the east. There was water towards the east and south of my place. When it was at its highest point it was just one lake of water right from the hotel all the way down to the railroad embankment to the culvert. There beside the culvert was much higher in the east end. It didn't go that way, it came west. Extended on down to the east side of Second avenue, east. There to the south of me to keep the water from running away was the railroad embankment. From the time I started down to the hotel until 5 o'clock there was considerable rain falling. A couple years previous to this time the water backed up a ways on Villard street. I think it was on the Fourth of July. No, it was the time of a picnic out here and hail storm. It came part way up Villard street, I know it was covered pretty well. It didn't run into my property. It was a sheet of water at that time from the culvert up part way in block 5. When I first came to Dickinson there were no buildings on what is shown as block 5. There was one on block 18. There were none east of there. There was probably one there in about nineteen or twenty. There was a kind of swale, a ravine in which sur-

face waters drained off through this culvert. It was dry most of the time.

Q. Is it a fact that at one time there was a slough or lake there?

A. No. I don't know anything about any lake. There was no lake.

Q. Was there a lake a little further over and up towards the east?

A. No. But the waters would run down there in that swale and all through about where this culvert was now located. The sides were grassy all along. I suppose it is a kind of ravine or swale that we see around the country, a good many of that kind. There was no grass on the bottom. There wasn't any grass there before the bridge was put in. I didn't come until after the track was laid. I don't know whether before the bridge was put in there was any worn spot along there. I am simply testifying that when I came to Dickinson there was a worn spot underneath where the waters went under that bridge. I came to Dickinson in 1884. I think the track was laid about three years before then. The water only ran down that ravine when it rained and in the spring of the year. There was no spring in the ravine. Nothing but surface water or storm waters or snow waters. I was awakened by the storm on the night of July 28, 1914, between 12 and 1, or about that time. The storm started, I think, about 1 o'clock. I got a telephone call from the hotel that the water was down in the basement, so I went down. It rained pretty hard for a while from 1 o'clock on, for probably about an hour. I left the house sometime around or about 2 o'clock. It was between 2 and 3 sometime.

Q. Were the streets covered with water as you walked down?

A. There was one place in particular that I know the water was over the sidewalk.

Q. The water was running down the street, was it; a good deal of it?

A. Yes, there was quite a little water. It wasn't raining so very hard when I went down town, little intermittent rainfalls. I would say I got to the hotel between 2 and 3 o'clock. At the time I got down there was water coming into the basement. It started with a hail storm, a little hail, but I don't think the hail was bad at all.

Q. At that time was the water flowing down Villard street towards the east?

A. When I came down there wasn't so very much on that end of town up there. There probably was some, the sidewalk was dry most

of Villard street. There was about one block covered along Villard street. The bottom of these basement windows are lower than the sidewalk. I imagine the deepest one is about 3 feet below the sidewalk. I think it was in 1911, two or three years before I saw water back up on Villard street. That was the only time I noticed it. I never had any water in my basement before.

I have conducted a hotel about ten years. There was some water on Villard street on this morning on the 28th of July, 1914, before I got to the hotel. Where I struck the water was about five blocks west of the hotel. There is a low place there. I think the water drains into a ditch. The other way, not past the hotel. *The city sewer emptied south of the culvert and on the south side of the railroad track, and below the culvert.*

When I first came here there was a bare spot which extended about 6 or 8 feet over the place where the culvert is now, and north up towards Villard street. It extended out to Villard street and probably across the street and then it disappeared; ran out into the grass there.

Q. A good portion of the city is drained in other places than in this culvert?

A. I don't think so. I think nearly all the city drains that way. I said there was one spot up here in the west of town, it kind of runs into a ditch. That's the only spot that I know.

Defendant next contends that "the undisputed testimony shows that the loss here might just as well have been occasioned by causes for which this defendant cannot be held responsible." He contends that the witness Leisch testified that he went down after the heaviest rain was over, and saw the city crossing together with several two by fours blocking the mouth of the culvert, and that at that time the culvert was not covered with water. "How long," he says, "the crossing had been there before Leisch came down, of course, nobody can say, and nobody seems to know how long it stayed there. Mr. Hughes and Mr. Reichert went down to the culvert between 4 and 5 o'clock, and they tell us that at that time the crossing was rather on top of the culvert, the water being completely over the mouth of the culvert. They cannot say whether the crossing was over the mouth of the culvert before they came down or whether somebody pulled it away from the mouth of the culvert or not. And they do not know whether Joe Leisch had made a

trip to the mouth of the culvert prior to their coming. What would be more expected than that the action of the waters as they kept getting higher would raise the street crossing up and finally, when the water was over the mouth of the culvert, deposit it on the top of the culvert?" "We thus," he argued, "have the fact undisputed that when Joe Leisch went down to the culvert alone it was blocked by this street crossing thus preventing and obstructing the flowage of the waters through it. Isn't it more than probable that this situation caused the waters to flood plaintiffs' premises, rather than any inadequacy of the culvert to take care of the waters if unobstructed? *We say the record conclusively shows that this flood and consequent loss might just as well have been occasioned by the blocking of the culvert as from any reason for which this defendant could be held responsible. And if this is true then, under the decisions of this court and the well-settled law, the judgment here cannot stand.*"

We can hardly concede the correctness of this contention. It is true that in the case of Meehan v. Great Northern R. Co. 13 N. D. 443, 101 N. W. 183, we held that in an action to recover damages for an injury alleged to have been caused by defendant's negligence, where it appears that there are two or more possible causes of the injury, only one of which is chargeable to defendant's negligence, the burden is upon the plaintiff to make it appear that it is more probable that the injury resulted from the cause for which the defendant is responsible. All that was proved in that case, however, was the fact of the accident, and all that we held was that the burden of proof was on the plaintiff to show the reason therefor; and that, since the conclusions from the fact of the accident would be just as apparent to a jury of intelligent men as they would have been to experts, it was error to inject into the case the opinions of the witnesses.

The case of Garraghty v. Hartstein, 26 N. D. 148, 143 N. W. 390, cited by counsel, falls far short of bearing out his contention. All that it holds is that it is the province of the court to determine whether, upon the facts most favorable to the plaintiff, negligence can properly be inferred; and that the jury cannot be permitted to arbitrarily and without evidence infer negligence; and that the evidence must affirmatively establish some circumstances from which the inference fairly

arises that the injury resulted from the want of some precaution which the defendant ought to have taken.

In the case of Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000, we held that a recovery was erroneously sought to be had upon expert testimony based upon evidence which was not positive, and the court in addition was satisfied from the positive evidence that contributory negligence existed.

In the case of Balding v. Andrews, 12 N. D. 267, 96 N. W. 305, 14 Am. Neg. Rep. 615, there was no evidence as to the cause or origin of the fire, and the same was sought to be proved by a declaration of a servant which was not part of the *res gestæ*. The holding was merely that the burden of proof was on the plaintiff to show both the cause of the fire and the negligence of the defendant, and that the evidence introduced for this purpose was not competent.

We can see no applicability in the case of Kinsel v. Andrews, 111 Ga. 390, 88 Am. St. Rep. 25, 40 S. E. 300. It was a case merely of the act of an intervening third party, which was the proximate cause of the damages, and which was shown by the complaint itself.

In the case of Wm. Tackaberry Co. v. Simmons Warehouse Co. 170 Iowa, 203, 152 N. W. 779, the court held that the flood was unprecedented, and that such being the case, positive negligence was sought to be proved in the construction of the bridge, and that, as the bridge was a bridge of a public corporation, its mere inadequacy was not sufficient, provided it was constructed according to plans and specifications of skillful engineers familiar with the locality.

In the case of Berninger v. Sunbury, H. & W. R. Co. 203 Pa. 516, 53 Atl. 361, the ice gorge was extraordinary.

The case of Atlantic Coast Line R. Co. v. Woolfolk, 189 Ala. 253, 66 So. 464, turned entirely on the proposition that the complaint did not show that the loss was occasioned by the defendant railway company at all.

The case of Scntman v. Baltimore & O. R. Co. 78 Md. 222, 27 Atl. 1074, merely decided that the question whether the damage was caused by the act of God was properly left to the jury.

In the case of Treichel v. Great Northern R. Co. 80 Minn. 96, 82 N. W. 1110, the court did not pass upon the question of negligence or the duty to maintain a culvert at all, but merely said that the

evidence did not prove that the embankment had anything to do with the flooding, but rather tended to show that the whole country was equally flooded.

In the case at bar there is at least some testimony which tends to show that the damage was occasioned by the ditch and culvert being insufficient in size, or by the entrance to the culvert being insufficient; the complaint alleging a lack of size, fall and capacity in both ditch and culvert. There is some evidence to the effect that the water was above the culvert. There is a claim, it is true, that the pressure of the water from the hills and the lay of the land made it stand above the level of the streets and the ditch. There is, indeed, some evidence that it had stood this way before. It was for the jury to say, however, whether this standing was not occasioned, if standing there was, by the insufficiency of the fall and the insufficiency of the size of the culvert. Perhaps the culvert would have been sufficient if the fall and approach had been sufficient. The standing in the past also and the runnings of the culvert full was evidence as to a lack of care and foresight on the part of the defendant.

It is also true that there is some evidence that the culvert was blocked by a part of the sidewalk. The evidence, however, does not show for how long this was, or with definiteness to what extent. It is not impossible, also, that the jury may not have believed the witness at all; for only one witness testifies to the fact, and he was an employee of the defendant company, and the relative size of the wooden piece and the iron culvert make the fact somewhat impossible. Must we say that a jury must believe a witness under these circumstances, or that this court, if the jury refused to believe him, must say that it does, and reverse the judgment?

A plaintiff is not bound to exclude by his proof all possibility that the loss may have occurred in some other manner or from some other cause than that contended for by him. He is merely required to satisfy the jury by a fair preponderance of the evidence of the truth of his contention. Farmers' Mercantile Co. v. Northern P. R. Co. 27 N. D. 302, 316, 146 N. W. 550; Rober v. Northern P. R. Co. 25 N. D. 394, 142 N. W. 22; Adams v. Bunker Hill & S. Min. Co. 12 Idaho, 637, 11 L.R.A.(N.S.) 844, 89 Pac. 624.

This brings us to a consideration of the question whether the rain-

fall or flood was so unprecedented and so extraordinary that it need not have been anticipated.

In considering this point we must first begin with the premise that the question before us is one primarily for the jury to pass upon, and all that we have to decide is whether the evidence is such that reasonable men could not have differed upon the proposition and whether the judgment of reasonable men *must* have been in favor of the contention of the defendants. See Soules v. Northern P. R. Co. 34 N. D. 7, L.R.A.1917A, 501, 157 N. W. 823; Chicago B. & Q. R. Co. v. Schaffer, 26 Ill. App. 280; Sentman v. Baltimore & O. R. Co. 78 Md. 222, 27 Atl. 1074.

We must also adopt the premise that the burden of proof in the matter is upon the defendant. See Soules v. Northern P. R. Co. supra.

The defendant contends that it has overcome the burden of proof by positive testimony; that never before did the waters flood the property of the plaintiffs; that the present culvert had been under the track since 1909, and that one just one fourth its size had been used for years prior to that time. This point, he says, was not strongly urged in the prior case of Soules v. Northern P. R. Co. supra, and that the conclusion is inevitable that either the flood was unusual and extraordinary or that the culvert was blocked up. In support of this contention he cites the case of Wm. Tackaberry Co. v. Simmons Warehouse Co. 170 Iowa, 203, 152 N. W. 779. In this case, however, not merely was the bridge constructed by a municipal corporation, but the fact of the extraordinary nature of the rainfall was conceded by the plaintiffs; the claim being merely that at the particular point of injury the flood was not unprecedented. On this point the court also held that the creek, *even if unobstructed, could not have carried the volume of water.*

He also cites the case of Kansas City, M. & B. R. Co. v. Smith, 72 Miss. 677, 27 L.R.A. 762, 48 Am. St. Rep. 579, 17 So. 81. The case, however, is not one of the obstruction of a stream or drainage channel, but of the obstruction of the overflow of a stream after it had become obstructed; the roadbed of the company running parallel thereto and about ¾ of a mile distant from the stream. He concedes and cites authority to the effect that freshets are regarded as ordinary which are well known to occur in the stream occasionally through a

period of years, although at no regular intervals. Gould, Waters, 2d ed. § 211 C.

He contends that the record shows that in the storm of July 28, 1914, and which is the one involved in the suit at bar, 2½ inches of rain fell between the hours of 1 or 2 and 6 o'clock, and the greater part of this rain fell between 12 and 4. He says that this rainfall is not unusual and extraordinary, "but the point he wishes to bring before the court is that this particular storm was unusual because of its character; the violence of the elements thus causing the water to rush down the streets in sheets and in sheds, as described by the witness." The position, on the other hand, of the plaintiffs was that the jury found, and correctly, that the storm or flood was one that a reasonably prudent man might reasonably have expected in the vicinity; that, although the property of the plaintiffs had not been flooded before, a rise of 1 or 2 inches on several prior occasions would have flooded it, and the railway company could not gamble upon so narrow a margin. They contend, and correctly, that the records of the Experimental Station show a 2.6 inch rainfall in a twelve-hour period in 1903, and the Bismarck Station, larger rainfalls in the same length of time, and that the flood of July 28, 1914, differed from prior ones in degree, and not in kind. They also point to proof of rainfalls of 1.06 inches in half an hour at Dickinson, and of 1.89 inches in half an hour at Bismarck, and .37 inches in five minutes and .73 inches in ten minutes. They also point to the evidence of the witness Hughes, to the effect that he had seen two storms just as hard as the one in question; to that of the witness Ray, who said that he did not think the storm was unusual until he went down town; to that of Reichert, who testified to a storm in 1912 when he was handling a broom in the lobby of a hotel and trying to keep the water from flowing into the lobby, and one about the same summer about as hard, and still another one on some Sunday, and that on several times the water had come back on the east to the St. Charles Hotel and had covered the street, and that he had packed mud and dirt around the tailor-shop window several times to keep out the water.

The question, to our mind, is one of notice and warning, more than it is of an unusual or extraordinary storm. And although the point is a close one, we do not feel justified in interfering with and overruling

the finding of the jury in this respect. Sentman v. Baltimore & O. R. Co. 78 Md. 222, 27 Atl. 1074; Bellinger v. New York C. R. Co. 23 N. Y. 42–46. We must, indeed, hold to what we believe to be the prevailing American rule, that the defense in such cases can only be that of *vis major* or the act of God, and that the act of God in its legal sense applies only to events in nature so extraordinary that the history of the climatic variations and other conditions in the particular locality affords *no reasonable warning of them,* and that damages cannot be avoided on the ground that the flood was an act of God, where, from geographical and climatic conditions, the flood *might have been anticipated, though it occurred infrequently.* Gulf Red Cedar Co. v. Walker, 132 Ala. 553, 31 So. 374, 11 Am. Neg. Rep. 179; Kansas City v. King, 65 Kan. 64, 68 Pac. 1093; Ohio & M. R. Co. v. Ramey, 139 Ill. 9, 32 Am. St. Rep. 176, 28 N. E. 1087.

Generally speaking, we are satisfied that the law applies practically everywhere that where a railroad obstructs a natural water course it must provide for the unobstructed flowage of the water. And when we come to the determination of what is or what is not a natural water course or drainway, we must be guided by the facts around us. We realize that in some states the test as to whether the grass has been worn from the ravine or gulley and whether the water usually flows therein is used. In the case at bar, however, there is some evidence that the grass from the bottom of the gulley was worn away for some distance north of the track. We do not, however, believe this to be material. No matter what may be the law in other states, we must, in North Dakota, take cognizance of the natural topography of the country, of its climatic conditions, and of the condition of its vegetation, and we must adapt the law thereto. It is not necessary in the case at bar to lay down a rule as to all surface waters. It is enough to hold, and we do hold, that the jury was justified in finding, or at least that there was competent evidence from which they could find, that the ravine or swale or depression served as a drainage conduit for a large area of country and was a natural drainway. It is sufficient to hold, and we do hold, that such natural drainways are subject to the same rules as if they were running streams and water flowed continuously therein. We find, indeed, throughout the authorities the words, "drain, drainway," and "depression," used just as often as

we find the word "waterway." See note to Soules v. Northern P. R. Co. L.R.A.1917A, 501.

In North Dakota practically all of these ravines or swales were in early days the beds of running streams. Our large treeless areas, indeed, have interfered with the continuous flow of most of our so-called rivers, such as the Mouse, the Goose, the Cannon Ball, and the James, and at certain seasons of the year grass grows over large portions of their bottoms. At other seasons they are raging torrents, and in a few weeks or days carry off large volumes of water which in a wooded area would take months to pass away. We cannot make any distinction between our so-called rivers and our natural drainways which drain large areas of land; for all these drainways are of great agricultural value. Often the only reason why springs are not therein (and their presence is insisted upon by some writers), is that the water, which in wooded areas sinks through the earth and later on comes up again in the form of springs, in North Dakota, rushes off at one time. Soules v. Northern P. R. Co. supra; 3 Farnham, Waters, 2555; Aldritt v. Fleischauer, 74 Neb. 66, 70 L.R.A. 301, 103 N. W. 1084.

Defendant and appellant next alleges that the court erred in refusing to submit a number of questions in the special verdict. This contention hardly deserves notice. As far as the first seven of these questions are concerned, it is sufficient to say that the trial court need not submit to a jury questions which are admitted by the pleadings or upon which there is no dispute. Lathrop v. Fargo-Moorhead Street R. Co. 23 N. D. 246, 136 N. W. 88; State v. Hanner, 143 N. C. 632, 24 L.R.A.(N.S.) 35, 57 S. E. 1.

As far as the eighth and ninth questions are concerned, and in which the court was asked to submit to the jury the question whether competent engineers had been employed to determine the size of the culvert, not only was there no dispute in the evidence, but, as we have before stated, the question was not one of the fitness of the engineers, but of the efficacy of the work.

It is next contended that the finding of the jury in the special verdict on the amount of the damages is not sustained by the pleadings or the instructions of the court. In reply to the question, "What was the amount of that damage?" the jury replied, "$3,200." All that the complaint prayed for was $2,999, and interest thereon at the rate of 7

per cent from the time of the service of the answer by the defendant. It is claimed by counsel for appellant that no proof was offered showing when the answer was served; that the attention of the jury was not directed to the date of service; that they were not instructed that it was their privilege to give or withhold interest as they saw fit; and that the proof offered by the plaintiffs tended to show damages totaling about $4,000. It also appears that the interest on the $2,999 claimed would have amounted to about $250, so the jury must have either found that the damages were less than $2,999, or else they ignored the *ad damum* clause entirely, and rendered a general verdict without the addition of interest for more than the sum asked or for less than the total proof. It is also urged that the plaintiff waived his right to interest by failing to request instructions on that point.

We find no merit in these contentions. The defendant admits that the case is one where interest could be allowed in the discretion of the jury. Johnson v. Northern P. R. Co. 1 N. D. 354, 48 N. W. 227. He admits that the plaintiffs' proof tended to show a damage totaling about $4,000. The complaint prayed for interest. The verdict, therefore, was not for an amount in excess of what the jury might have returned. If the defendant was doubtful whether the $3,200 included interest or not, he could have raised the question on the trial. This he does not appear to have done. It would appear to be too late to raise it at this time. The cases cited by counsel are not in point. The case of Parsons v. Jameson, 70 N. H. 625, 46 Atl. 687, simply held that the court was powerless to add interest on his own motion, where no interest had been allowed by the jury or instruction asked therefor.

In the case of Fiore v. Ladd, 29 Or. 528, 46 Pac. 144, also, the jury had been discharged.

The same is true of Cookville Coal & Lumber Co. v. Evans, — Tex. Civ. App.—, 135 S. W. 750.

The same is also true of Morrissey v. Morrissey, 180 Mass. 480, 62 N. E. 972.

In all of these cases the court held that the allowance of interest was for the jury, and that the court could not allow it of his own motion. They are not cases where the presumption would be that the jury allowed it. Section 7143 of the Compiled Laws of 1913 provides that "In an action for the breach of an obligation not arising from

contract, and in every case of oppression, fraud, or malice interest may be given in the discretion of the jury."

We must presume at this time that the jury followed the law, and limited their estimate of the injury to the property to $2,999, and that the excess was allowed as interest.

It is next urged that the trial court erred in allowing the attorneys for the plaintiffs to argue the case generally to the jury, and to explain the legal effect of certain of the special findings. After the address of Mr. Pugh, who opened the closing argument for the plaintiff, the following objection was made by the attorney for the defendant:

"Counsel for the defendant objects to the nature and character, the general nature and character, of the argument made by counsel for the plaintiffs to the jury, and objects specifically to the following statements made by counsel: 'If this culvert was too small then, of course, the railway company would be liable.' And objects to the statement made by counsel for the plaintiffs when the court's attention was called to this statement: 'If it was too big, then I don't know whether they would be liable or not. Anyhow, that's our contention.' And the further statement made in the course of the argument, that the railway company is liable for damage occurring if this was not an unusual storm, and we ask the court to let the record show that these statements were made and objected to at the time of the argument."

The Court: "All right."

Mr. Pugh: "Of course, we would like to have it appear that those statements were not made in that language."

There can be no question of the impropriety of the remarks made by Mr. Pugh if the remarks ascribed to him were in fact made. We cannot, however, reverse the judgment on that account.

Not only was this objection not made until after counsel for appellant had himself argued his case to the jury, but the record does not show what the argument really was, and we have no means of ascertaining the fact. The only error that we can consider, therefore, is that raised by counsel for defendant later on, and in relation to the closing argument made by the other attorney for the plaintiffs. This we can consider as the argument was taken down in shorthand and is in the record.

The objection is as follows:

Mr. Conmy: "During Mr. Pugh's argument, counsel interrupted at various times and called his attention to the improper features of his argument, especially where the jury was told as to how these answers to various questions would affect the liability of the defendant. To avoid constant interruption of counsel we asked the court reporter to take down Mr. Murtha's argument to the jury, and we now except to that argument as being wholly unfair, containing misstatements of fact, and telling the jury time and time again what effect its answer to various questions would have on the liability of this defendant, and that it is an attempt to prejudice and bias the judgment of this jury in its answers to the various questions given."

"Counsel also assigns as error the failure of the court to instruct the jury to disregard the statements of counsel as to how their findings or answers to certain other questions in the special verdict would affect the legal liability of the defendant for the damage in question."

As far as the argument of Mr. Murtha was concerned, counsel for the appellant points out no particular defect, with the exception that he argued the case generally to the jury. It is urged that he frequently told the jury what would be the effect of their particular answers. We can, however, find no evidence of this in the argument. It is true that he said: "To establish the negligence, to establish the liability of the railway company, it is necessary for the plaintiff to prove that the railroad company were negligent in some way, and we have shown that they put a pipe in there to carry off the water; that by actual test it was too small, and time and time again before this flood in question that pipe had filled up and failed to carry off the water; and it is our contention that a reasonably prudent man under those circumstances would have put in a bigger pipe, and the test on that would be what a man would do in regard to his own property," etc. Among the questions submitted to the jury, however, are the questions:

(2) "Was the 4-foot culvert maintained by the defendant, if not obstructed by any floating street culvert, crossing or other *débris*, of sufficient size and capacity to take care of the ordinary and usual storm waters which might come to it?"

(3) "If you answer question No. 2, 'No,' should an *ordinarily pru-*

*dent man in the exercise of ordinary and usual care* have known that said culvert was not sufficient in size or capacity?"

(4) *"Would an ordinarily prudent person under similar circumstances* have installed the 4-foot culvert in question here?"

(5) "Is it just as probable that the flooding of plaintiffs' premises and the damage to his property was occasioned by causes *other than the negligence of the defendant railway company,* if *you find said railway company was negligent?"*

(9) "Should the ordinary prudent man residing in this region have anticipated from his general experience such a storm and rainfall as occurred on July 28, 1914?"

These questions were asked by the defendant himself, and clearly submitted the question of negligence to the jury.

The complaint specifically alleged negligence on account of the insufficient size of the culvert, and the whole case was tried on that theory.

It is true, as said by us in the case of Morrison v. Lee, 13 N. D. 599, 102 N. W. 223, that "the object of the law is to secure fair and impartial answers to the questions submitted, 'free from bias or prejudice in favor of either party or in favor of a particular result.' The jury should not, therefore, be informed, either by the instructions or by the form of the questions, how any particular answer will affect the case, or what judgment will follow in consequence of it, 'for to impart such information would almost necessarily defeat the object intended to be secured by a special verdict.' And for this reason it is error to inform the jury under what circumstances the plaintiff can or cannot recover."

In the case at bar, however, the questions which were submittd by the defendant himself, to say nothing of the pleadings and the whole conduct of the trial, must have made the importance and consequence of the inadequacy of the culvert known to the jury, and it would be absurd to contend that a party is prejudiced by reference to a fact on argument which is already well known to the jury and which has been called to their attention by the defendant himself.

The cases cited by counsel for defendant are not in point. In the case of Morrison v. Lee, supra, the error complained of was found in the instructions of the court, and not in the arguments of counsel.

In the case of Snider v. Washington Water Power Co. 66 Wash. 598, 120 Pac. 88, the court was merely dealing with the discretion of

the trial court in granting a new trial after supposedly prejudicial remarks had been made by counsel.

In the case of Guild v. Moore, 32 N. D. 432–476, 155 N. W. 44, we said: "An argument whereby the jury is informed of the effect any particular answer or answers would have upon the ultimate rights of the parties would doubtless be improper."

We did not say, however, that a verdict would be overthrown when the remarks merely alluded to facts of which the jury must have been cognizant, and which the defendant himself had caused to be submitted to them.

It is next urged that the trial court erred in refusing to give the following instructions:

"One of the questions submitted to you for determination is whether the storm and flood in question here was an ordinary storm and flood, or an extraordinary one. This question you should answer in accordance with the facts and the law with reference to what constitutes an ordinary storm. I charge you that extraordinary floods are floods which are of such unusual occurrence that they could not have been foreseen by men of ordinary experience and prudence. Ordinary floods are those the occurrence of which may be reasonably anticipated from the general experience of men residing in the region where such floods happen.

"I further charge you that, even if it should appear that one or two times before there had been storms and floods the equal of the one in question here, still that would not warrant you in holding this storm a usual and ordinary storm, unless it appears that it was such a storm as could be reasonably anticipated from the general experience of men residing in this region."

The refusal of these instructions could not possibly have prejudiced the defendant, as they placed a greater liability on the defendant than did the mere question of whether the storm was unusual and extraordinary which was submitted to the jury in the special questions. Under the proposed instructions, indeed, the defendant would have been liable for a storm which should have been anticipated, even though not usual. The questions as submitted, and without instructions, left the jury to decide if the storm was usual. If it was usual the defendant should have anticipated it, and a finding that it was usual would have carried

with it the legal consequence. The only question is whether there was any evidence to show that the storm was usual and to sustain the finding. We are satisfied that there was.

It is next claimed that the court erred in sustaining plaintiffs' objection as follows:

Q. Have you ever found any of them to be insufficient?

Counsel for plaintiff: We object to that on the ground that it is not a proper test of the qualifications, and has no bearing on this case.

The Court: Objection sustained.

Mr. Conmy: The defendant offers to show by this witness that he has at various times installed culverts in similar basins to this, and that these culverts have at all times proven sufficient.

Mr. Murtha: I have no objection to that if you will let me show that they have put in other culverts that are insufficient.

The Court: Objection sustained.

We think there was no error in this matter, and that the admission of the testimony would merely have drawn in collateral controversies the hearing of which would have extended the litigation beyond limit.

It is next contended that the court erred in admitting in evidence exhibit A on account of a writing or indorsement which occurred thereon. Exhibit A was a map, and the writing or indorsement was explanatory thereof. Appellant has shown no prejudice likely to have arisen therefrom, and we can see none.

It is next urged that the court erred in overruling defendant's objection to the following question:

"And prior to this filling in, was the railroad property north of the tracks and south of Villard street higher or lower than Villard street?"

The objection to this question is based upon the theory that the railway company would only be liable for positive negligence in the construction of the embankment. We have, however, already held that the question was one of duty and sufficiency, rather than of positive negligence; and such being the case, and the lay of the land, its drainage, and the nature of the drainage area, being matters of much moment, the evidence was not inadmissible.

The judgment of the District Court is affirmed.

CHRISTIANSON, J. (dissenting). I concurred in the opinion in Soules v. Northern P. R. Co. 34 N. D. 7, L.R.A.1917A, 501, 157 N. W. 823, as I believed that under the evidence in that case it was for the jury to say whether the defendant was negligent in constructing its culvert; whether the flooding of the premises involved in that case was occasioned by the inadequacy of such culvert; and also whether the storm was of an unusual and unprecedented character. The evidence in the present case, however, is in many particulars different from that adduced in the Soules Case. In the Soules Case there was evidence of the amount of rainfall during a nine-hour period only. 34 N. D. 28. In this case the evidence shows that 2.6 inches of rain fell from the time the storm commenced (about 1 o'clock A. M.) until 6 o'clock A. M. The worst part of the storm was over about 4 o'clock, although it rained somewhat between then and 6 o'clock. The water stopped running into the hotel around 4 o'clock.

In this case there is, also, a far stronger showing as to the adequacy of the culvert. The elements of uncertainty with respect to the surrounding conditions which existed in the Soules Case do not exist here. The testimony of three civil engineers of unquestioned competency and integrity (including a former state engineer of this state) shows that the culvert was adequate, not only to take care of all the rain which fell, but was adequate to take care of a rainfall of $2\frac{1}{2}$ inches if it all fell in fifteen minutes. While it is true that, as a general rule, the testimony of experts is not necessarily conclusive upon the jury and may be disregarded, there are certain facts which have been established by experiments and observation, and certain deductions based upon past experience, which are accepted as the best evidence of the matters to which they relate. The testimony of witnesses contradicting almanacs, tables of logarithms, or interest tables, would hardly be held to raise an issue of fact as to any question on which the witnesses differed from the almanac or such tables. Now, would the testimony of a witness based upon his feelings and observation as to heat and cold be deemed sufficient to overcome the registrations of a thermometer of conceded or proven accuracy? The testimony of the engineers in this case is based upon measurements which they made of the drain basin, the slope of the ground, and the size of the culvert. These are not matters of uncertainty. They are established as absolute facts. There is, of

course, no difficulty in determining how much rain will fall in a given area where there is a rainfall of 2.6 inches. Nor is there any serious difficulty in determining how much water can run through a culvert of a given size placed at a certain angle, during a given time. These matters can be established by computation based upon certain well-established physical laws. There is no contention that the computations made and testified to by the engineers in this case are inaccurate or based upon inaccurate premises.

In my mind there is no question of fact in this case upon which reasonable men can differ. The evidence shows that the culvert in question received actual tests as to its capacity on various occasions, among others on June 26, 1915, when 1.16 inches of rain fell in half an hour. During this rain although the high water came up over the sidewalk in front of Soules & Butler's store and within 5 feet of their building, still the culvert was never forced to more than one third of its capacity, and during this storm the elevation of water was greater in the street in front of Soules & Butler's store than at the entrance to the culvert, viz., 99.15 inches at the Soules & Butler's store and only 96.3 inches at the culvert. The unimpeached testimony of the engineers based upon the physical facts in the case, and such physical facts themselves, in my opinion, clearly show that the overflow was not caused by the inadequacy of the culvert. In fact they fully bear out the contention of Judge Robinson that "had there been no embankment the water would have piled up just the same and would have run over the curbing and into the unprotected basement."

ROBINSON, J. (dissenting). The complaint avers that on July 28, 1914, the plaintiffs were in possession of certain hotel property in Dickinson. The basement was used as sample and store rooms and as a pool and billiard hall. That upon its right of way through the city the defendant maintained a high-grade embankment and crossed a natural water course, the natural drainage for the surface and storm waters of a large area. The hotel is in the basin drained by the water course, and that in constructing its road and embankment defendant filled up and obstructed the water course, leaving only a small open ditch and a small iron culvert to carry off the water; that on July 28 storm waters dammed against the embankment and flooded the base-

ment of the hotel and damaged them to the amount of $3,000. Defendant appeals from an order denying a new trial and from a verdict and judgment for $3,200.

The jury gave a special verdict. In answer to the material question: Was the storm and flood of July 28th an unusual or extraordinary one? the answer was, "No." The answer was clearly and obviously untrue. There is no claim that there ever was another such a flood in Dickinson. If the flood were of ordinary occurrence, then it was an act of folly and neglect for the plaintiffs to put their goods in an unprotected basement liable to be flooded by an ordinary storm. It must be presumed they knew of the embankment and the culvert and the water course and the drainage of the city, and with that knowledge they did not fear a flood and they took no precaution to protect their hotel basement by cement walls or otherwise.

The hotel is on a rather level basis at the foot of a long and rapid descent on a street which had been curbed and paved, so that when the rain fell in torrents the water rushed down the rapid incline and piled up on the level of the hotel. Had there been no embankment the water would have piled up just the same, and it would have run over the curbing and into the unprotected basement.

Dickinson is in a semiarid country, where the average annual rainfall is about 22½ inches. One inch in twenty-four hours would be a normal or rather excessive rainfall. For ten years prior to July 28, 1914, the average precipitation on days of snow and rain was less than a quarter of an inch. It was about ⅕ of an inch. Except on July 28, 1914, the largest rainfall shown on the record of the weather bureau was 2.6 inches. That was in May, 1903. In the year 1914 the total precipitation was 15.39 inches, and yet in July, 1914, there was over 4 inches in a few hours. That is, the rainfall in a few hours of that day was one fourth of all that fell during the year; and the jury says that was not extraordinary. Now, that is perfectly absurd and manifestly untrue, and every juror knew it. Every juror knew the rainfall was extraordinary and very extraordinary.

But railroad companies do so many mean things, and make overcharges, and pile up so much wealth, that jurors and judges do like to get even with them once in a while; and while that may be some excuse, we must not turn the law into a mockery of justice.

The Dickinson storm of July 28th was such a storm as never occurred before and may never occur again. No party was bound to look for and to guard against any such an extraordinary occurrence. Hence, the judgment should be reversed.

## On Rehearing.

BRUCE, Ch. J. An able and exhaustive reargument has been had in this case, yet we are constrained to adhere to our original holding. The complaint alleges:

"That the defendant company in constructing said embankment through the city of Dickinson, and across said water course and channel of drainage, unnecessarily, carelessly, and negligently entirely filled up and destroyed said water course and channel of drainage, and in the place and stead thereof put through its embankment, part way, a small crooked open ditch and the other part of the way a small iron culvert connecting with said ditch, which said ditch and culvert were entirely insufficient in size and fall to carry off the waters of said water course or storm waters of said drainage area or basin in times of rain, and were so carelessly and negligently constructed and maintained that it entirely failed to carry off said water; that because of the negligent construction and maintenance of said embankment, the negligent construction and maintenance of said ditch and culvert, and the lack of size, fall, and capacity of said ditch and culvert, on July 28, 1914, storm waters dammed up against said embankment and flowed over and upon the hereinbefore described premises of the plaintiffs, and into said basements.

"That on July 28, 1914, and for a long time prior thereto, the defendant had notice and knowledge of the fact that said embankment entirely destroyed said drainage channel, and that said ditch and culvert were insufficient to carry off the waters of said drainage basin and channel in times of rain."

There can be no question that, before the construction of the railroad embankment, the waters of the area in question flowed down to the Hart river through a natural water course, ravine, gully, or natural depression, having a fixed and determined course and which formed the natural and usual channel for the escape of the waters," and that,

even if the so-called common-law rule of surface waters had maintained, the upper landowners would have had the right to use such channel. It is also the established law that surface waters having an accustomed flow in a drainage channel or waterway having well-defined banks, may not be stopped by an embankment across the channel so as to divert the waters to the injury of adjoining proprietors. See 40 Cyc. 648; Aldritt v. Fleischauer, 74 Neb. 66, 70 L.R.A. 301, 103 N. W. 1084.

It seems to be well established also, and this, even where the common-law rule applies, that where a railroad crosses a ravine, gully, or natural depression in the earth, which forms the natural and accustomed channel for the escape of surface waters, it is incumbent upon the company to make provision for the flowage of the same. See Jungblum v. Minneapolis, N. U. & S. W. R. Co. 70 Minn. 153, 72 N. W. 971; Smith v. Chicago, B. & Q. R. Co. 83 Neb. 387, 119 N. W. 669; Quinn v. Chicago, M. & St. P. R. Co. 23 S. D. 126, 22 L.R.A.(N.S.) 789, 120 N. W. 884; 40 Cyc. 644.

The controversy in the case at bar has been mainly over the question of the size of the culvert. The complaint, however, charges that the defendant carelessly and negligently entirely filled up and destroyed said water course and channel of drainage, and in place thereof put through its embankment, part way, a small crooked open ditch, and the other part of the way a small iron culvert connecting with said ditch; that because of the negligent construction of said embankment, the negligent construction of said ditch and culvert, and the lack of size, fall, and capacity of said ditch and culvert, on July 28, 1914, storm waters dammed up against said embankment, etc.

If, then, the jury were led to believe, and we think there was evidence from which they might form the belief, that after the filling in and erection of the embankment the construction of both the ditch and the culvert in the place of the original water course were not sufficient to carry off the waters of the water course as it originally existed, then they were justified in holding for plaintiff. In this view of the case, even if the culvert was sufficient to carry off the waters which were in the ditch, which was a matter of fact, not more than 30 yards in length, it by no means followed that the ditch and culvert together, as constructed, were adequate for the purpose, and to take the flowage of the

original water course over which in earlier years the railroad company had constructed a pile bridge.

We realize that the opinion of experts, such as those as in the case before us, should be given great weight. Those experts, however, only testify as to the adequacy of the culvert when the waters got to it. They did not testify positively as to the adequacy of the whole arrangement, and there is much conflict in relation thereto.