ROY E. HENDERSON, Respondent, v. WALKER D. HINES, Director General of Railroads, Appellant.

(183 N. W. 531.)

**Waters and water courses — natural surface drainway held not subject to legal principles applicable to water courses.**

1. A natural drainway serving the purpose alone of draining surface waters, but not otherwise possessing the constituent elements of a water course is not subject to the principles of law applicable to a water course.

**Waters and water courses — easement theory of civil law imposing servitude on lower lands not applicable in North Dakota.**

2. The common law principles applicable in this state and the conditions best suited to land development require rejection of the easement theory of the civil law imposing a servitude and property right upon lower lands subject to the reception of surface waters from a dominant tenement.

**Waters and water courses — right of upper and lower landed proprietors protected under the rule sic utere tue.**

3. The rights of both upper and lower landed proprietors are fully protected under the rule of law that permits the land owner to use and enjoy his land and dispose of hostile surface waters thereupon subject to the application of the principle "sic utere tuo."

**Waters and water courses — land owner liable for negligently obstructing natural drainway to injury of upper proprietor.**

4. Under such principle of law, a duty is imposed upon the land owner which renders him liable for his negligent act in constructing an embankment or obstruction across a natural drainway so as to thereby impound or dam up flood waters upon the land of the upper proprietor.

**Waters and water courses — negligence of railway company in obstructing natural drain held for jury.**

5. Were a natural drainway serves purposes of conveying surface waters from a drainage area comprising some 168 acres in the city of

Dickinson and a Railway Co. constructed an embankment and other ob-
structions in such drainway and installed, in lieu thereof, culverts for the
purpose of providing an escape for such surface waters, it is *held* that
the question of its negligence under the principles of law stated is a ques-
tion of fact for the jury.

Waters and water courses — evidence insufficient to establish negligence of
railway company in constructing culverts to carry off flood waters.

6.   Where the jury, pursuant to special questions, found   that   the
storm which occasioned the damage was an unusual and extraordinary
storm and that culverts installed by the city and which connected with
the Railway culverts were of insufficient capacity to handle the surface
waters resulting, it is *held* that the general verdict rendered does not
establish the negligence of the Railway Co. and a new trial should be
granted.


Opinion filed June 6, 1921.


Action in District Court, Stark County, *Lembke,* J.

Defendant has appealed from the judgment in favor of the plaintiff.

Reversed and a new trial granted.

Opinion of the Court by *Bronson,* J.

*Young, Conmy,* & *Young,* for appellant.

"When the special findings of fact are inconsistent with the general
verdict, the former controls the latter and the court must give judgment
accordingly." § 7633, C. L. 1913.

"Extraordinary or unprecedented floods are floods which are of such
unusual occurrence that they could not have been foreseen by men of
ordinary experience and prudence. Ordinary floods are those, the occur-
rence of which may be reasonably anticipated from the general experience
of men residing in the region where such floods happen. Soule v. N. P.
Ry. Co. 34 N. D. 8.

"And this is in accordance with the American doctrine as announced
by the supreme courts of the various states. The American cases lay down
the doctrine that, for damages accruing from extraordinary floods, or
other causes that may be attributed to the act of God, or which cannot
ordinarily be foreseen or prevented, there can be no liability. China v.
Southwick, 12 Me. 238; Bell v. McClintock, 9 Watts, 119; Bridge Co. v.

Navigation Co. 4 Rawle, 9; Everett v. Tunnel Co. 23 Cal. 225; Hoffman v. Water Co. 10 Cal. 413; Wolf v. Water Co. Id. 541; Lapham v. Curtis, 5 Vt. 371; Higgins v. Canal Co. 3 Har. (Del.) 411; Canal Co. v. Ryerson, 27 N. J. Law 457; Tenney v. Ditch Co. 7 Cal. 335; Richardson v. Kier, 34 Cal. 63; Shrewsbury v. Smith, 12 Cush, 177, etc.; Hannaher v. St. Paul M. & M. R. Co. 5 Dak. 22-23; Southern Ry. Co. v. Plott, (Ala.) 31 Sou. 33; Price v. Oregon R. Co. (Ore.) 83 Pac. 843.

"A person building a fence and gate across a stream and constructing culverts therein is not liable for the overflow of water caused by the breaking of a reservoir or dam over which he had no control, or by an unprecedented downpour of rain precipitating into the stream a flood not reasonably anticipated." American Locomotive Co. et al v. Hoffman, (Va.) 54 S. E. 25; Brown v. C. B. & Q. Ry. Co. (8th Cir.) 195 Fed. 1007; Eagan v. Central Vermont Ry. Co. (Vt.) 69 Atl. 732.

"The rule of law in such cases is that defendant is only required to take precautions against ordinary storms which occur in the vicinity; and if the damage would have occurred by the act of God, notwithstanding the obstruction, even if there were negligence on the part of the defendant, damages cannot be recovered." Kansas City P. & G. R. Co. v. Williams, (Ind. Ry.) 58 S. W. 570, 571; Ohio & M. Ry. Co. v. Thullman, (Ill.) 32 N. E. 529; L. & N. Ry. Co. v. Conn. 179 S. W. 195.

Under the settled law in this state, if the loss is caused by joint wrong of the parties, or on account of reasons for which defendant is not re sponsible all the damages cannot be recovered from the one defendant. Boulger v. N. P. Ry. Co. 171 N. W. 632, (N. D.); McDonough v. Russell-Miller Milling Co.; Meehan v. G. N. Ry. Co. 13 N. D. 443, 101 N. W. 183; Balding v. Andrews & Gage, 12 N. D. 267; 96 N. W. 305.

*T. F. Murtha,* for respondent.

"If reasonable care and foresight have been exercised in construction of a railroad, the railroad company cannot be held liable, but if there was negligence in the construction of the bridge, embankment, or other work which contributed to the injury, it is no defense that the flood was unexampled or overwhelming." Vyse v. Ry. (Ia.) 101 N. W. 736.

"A plaintiff is not bound to exclude the possibility that the accident complained of might have happened in some other way than that contended for by him. He is merely required to satisfy the jury by a fair preponderance of the evidence of the truth of his contention." Reichert v. N.

P. 39, N. D. 114, (supra) § 4 of syl.; Vol. 1 Sackett's Inst. § 391 to § 397, pp. 321 to 326. There appears to be not even a shadow of objection to the instructions. 17 Cyc. 131 (V.) 5 Enc. of Evidence, 643; Laughlin v. Ry. 28 N. W. 873; Jones on Evidence, § 390 p. 491; 17 Cyc. 267 (3); 17 Cyc. 262 J. 269; 42 L. R. A. 753-762-764. 22 L. N. S. 1039. Commonwealth v. Leash (Mass.) 30 N. E. 163; § 4 Syl. (See bottom half of last column p. 164.)

BRONSON, J. This is an action for damages caused by flood waters. The defendant has appealed from a judgment entered upon a general verdict and special questions submitted to the jury. The identical property that was involved in Soules v. N. P., 34 N. D. 8, 157 N. W. 823, L.R.A. 1917A, 501, is involved in this action. The same drainage area and the same drainway that were involved in Soules v. N. P., supra, Boulger v. N. P., 41 N. D. 316, 171 N. W. 633, and Reichert v. N. P., 39 N. D. 114, 167 N. W. 127, are likewise concerned. In the three cases mentioned damages were asserted through a storm which occurred on July 28, 1914. In this action damages are claimed for a storm that occurred on August 21, 1918. In the Reichert and Boulger cases, supra, the properties involved were located about a block, westward or northward, from the property involved herein. The following facts appear in the record:

Under conditions in a state of nature, prior to the development and growth of the city of Dickinson, as well as the construction of the defendant railway, there existed a territory composing a part now of the city of Dickinson and comprising about 168 acres, which naturally drained into a so-termed drainway southeasterly across the right of way of the defendant, and thence into the Heart river. In the growth and development of the city this drainage area has been platted into blocks and streets with connecting sewer facilities, grading of streets, curbs, gutters, ditches, and culverts. In this drainage area, plaintiff's leased property (lot 13, block 5) is situated, fronting upon Villard street, which abuts upon and parallels defendant's right of way. Comparatively considered, this drainage area, block 5, is rather low and flat, the grounds to the northward and westward sloping and being higher. The surface waters accordingly flow from the northward or westward along or towards block 5 southeasterly, where eventually they passed through this drainway into the Heart river. The defendant, in the improvement of its right of way several years ago, removed a bridge over this drainway, and has filled up the lands in the low places around this drainway, and installed a cast iron culvert under its

right of way 250 feet in length, and 4 feet in diameter, with a drop or slope of 5 feet, and a cross sectional area of 12½ square feet. There the embankment of this right of way is some 4 feet above the north end of the culvert, and, extending in a westward direction along Villard street, is higher than the crown of the street in front of plaintiff's property. There the gutter is 12 inches, the curb 3½ inches, and the level of plaintiff's street line, 3 inches lower than the crown of the street. In addition, upon the right of way and upon the site of a part of this old drainway, there was constructed a wholesale grocery building abutting upon Villard street. There this drainway was filled up or obstructed. In lieu thereof, in the street with the permission of the city, the defendant installed a double concrete culvert about 185 feet long, with a cross sectional area of about 24 square feet. This culvert connected on the east end with an open ditch that ran some 100 feet, emptying into the culvert in the right of way, and on the west side with city culverts. These city culverts were located at the intersection of Villard street and Second avenue, two running east and west, and two, north and south, and having a cross sectional area of about 19 square feet. Thus were methods of disposition provided for the surface waters of this drainage area. If the city culverts were unable to take care of the water, the resultant effect was an overflow upon the street there which, except through the culverts, could not escape southward off the street along the old drainway by reason of the railway embankment, the construction of the wholesale grocery building, and the filling up of the old ditch or drainway there formerly existing.

On August 21, 1918, between 9 and 10 a. m., a heavy rain, accompanied by some wind, fell to the extent of 1½ inches at Dickinson. Witnesses varied as to its duration from 20 minutes to one hour. Plaintiff testified that it lasted about one hour. In a short time the streets surrounding block 5, particularly Villard street, were overflowing with water. Into the basement of plaintiff's hardware store, the water ran in through manholes in the front sidewalk and through basement windows broken by the pressure of the water. The water filled his basement (8 feet deep), and rose upon the ground floor to a depth of about 10 or 11 inches.

The same day, the water receded upon the ground floor. It was the third day before the basement was entirely drained, the sewer appearing to be clogged. Plaintiff testified that the water in the street was coming from the west and the east; that when it came into the store it was backing up from the east (that is, from the place where the city culverts are

located some 150 feet eastward. Numerous witnesses testified. Testimony was introduced that Villard street in front of plaintiff's property was a sheet of water clear across; that the streets surrounding block 5 were flooded with water. One witness testified that there seemed to be a lake of water down First street (north of block 5) and Second avenue (east of block 5). Another witness testified that at the Masonic Temple, two blocks northward and westward from plaintiff's property, and where the elevation is 19 inches higher than plaintiff's property, the water rose upon the building to the depth of 3 inches. One of plaintiff's witnesses testified that as soon as the storm stopped somewhat he started from a store in the same block as plaintiff's property, but on higher ground.   He waded all the way around the streets to plaintiff's property; water up to the knees, more or less, dependent whether walking in the streets or upon the sidewalk; he walked over to the culvert in the right of way; saw the water there level with a 4-inch projecting flange, which would make the water 4 inches above the top of the opening; 15 or 20 minutes later he went down again, and noticed that the water then was probably about 4 inches below the top of the pipe. Another of plaintiff's witnesses testified that at Soules & Butlers corner, where city culverts are located in the street the water was over his knees in the middle of the street and up to his knees on the sidewalk; that he walked down to this culvert in the right of way;   remained there one-half hour; that the water was above the top 3 or 4 inches, maybe 6 inches; that it stood at that height 15 or 20 minutes, and then started to lower; that when he left the water in culvert was 3 inches down. Other witnesses testified to the water running into places of business and filling, or partially filling, some basements.

Testimony was offered that the top of the cast iron culvert under the right of way is about 10 inches lower than plaintiff's property; that before water would back up from the location of the city culverts it would rise in the street there to a depth of 4 or 6 inches; that such water upon such street would have passed under natural conditions through the drainway into the river.

Expert testimony on the part of the defendant was offered that the culvert in the right of way was planned so as to take care of a 3-inch rainfall upon the drainage areas concerned in an hour, or a continuous rainfall for any length of time of 1 inch per hour; that the 3-inch rainfall per hour in the drainage area would give a run off of 123 cu. feet per second; that the culvert had a capacity of 277 cubic feet per second. No expert

testimony was offered concerning the cubic feet per second capacity of the city or double concrete culverts; that if the water was 9 or 10 inches high in the Henderson store it would have to be one foot and a half above the cast iron culvert in order to back up to such height. Testimony was afforded from the records of the experimental station showing that on September 5, 1911, there was a rainfall of 1.65 inches; on August 9, 1909, 2.75 inches; on July 27, 1914, 3.51 inches; on June 11, 1915, 1.52 inches; on June 22, 1916, 1.44 inches. Testimony was also offered to the effect that there was an obstructing projectional wall impairing the efficiency somewhat of the double concrete culverts; that mud and silt collected therein; that the course in which such culverts ran with their right angle connections served to retard the flow of water. The jury in answer to the special questions found that the rainstorm of August 21, 1918, was an unusual and extraordinary rainstorm; that the 4-foot cast iron culvert and the double box concrete culverts maintained by the defendant were not of sufficient size and capacity to take care of the storm waters which might reasonably be expected in this locality; that likewise the city culverts across Villard street and Second avenue were not of sufficient size and capacity. A general verdict was returned for the plaintiff for $2,355.78.

## Decision.

The law of the case has been stated in the cases heretofore mentioned. The principle of law therein stated, however, must be confined strictly to the particuar facts in each case involved. Again, the principle of law applicable in this case must be determined upon the record facts. This case involved the disposition of surface waters. The drainage of the area within the city of Dickinson, wherein plaintiff's property is located, is through run-off channels artificially or naturally provided. The facts in this record do not warrant the conclusion that the drainway, or run-off channel involved is a water course. Froemke v. Parker, 41 N. D. 408, 171 N. W. 284. Most favorably considered, this run-off channel, in a state of nature, served simply the purpose of carrying off surface waters from the drainage area involved herein as it then existed in a state of nature. The record falls far short of demonstrating the constituent elements necessary to establish a water course. Usually in an action concerning a water course, legal rights revolve about the rights of user and enjoyment. On the contrary, concerning surface waters, legal problems are concerned, generally speak-

ing, with methods of disposition and removal. This action is essentially ar action concerning the disposition and removal of surface waters, and for damages by reason of failure to properly provide for methods of dis-position and removal. It is not an action for the diversion or obstruction of a water course. In such cases the rights of the party injured ordinarily are property rights on which an action may be based for infringement thereof. This is an action for breach of a duty; for lack of care, and for negligent acts of commission or omission. Although it may be the duty of a lower landowner who obstructs or embanks a natural drainway to provide for the natural passage of water, which may be reasonably anti-cipated in the drainage area concerned, all under the particular facts and circumstances of a particular case, nevertheless such principle of law must be considered in connection with the duty of such landowner in providing means of disposition and removal of surface waters. The rule is not to be construed to mean that a mere runway or drainway is in such case to be considered upon the principles of law that apply to water courses. In such case, the duty that exists is the duty that is imposed upon all land-owners concerning the disposition of surface waters.

In enunciating principles of law concerning this duty of the lower landowner, much legal discussion has been had in our American courts concerning the so-termed common enemy rule and the civil law rule. A re-view of these cases in the aggregate perhaps leads rather to confusion than clarification. The fundamental inquiry involved in the consideration of the principles to be applied is to first ascertain whether the law, under a common-law jurisprudence, considered in connection with the peculiar topographical and climatological conditions of the country, leans toward the easement theory of the civil law, or towards its rejection.

Fundamentally, the landowner, concerning surface waters, has the right to use his own land subject to the so-termed principle, "sic utere tuo ut alienum non lædas." This is a legal right that also involves a recipro-cating legal duty, for breach of which an action may be maintained. Pur-suant to the common enemy theory, in its strict application, an artificial obstruction or embankment of a natural runway for the disposition of surface waters may or may not involve a liability dependent upon the ap-plication of the "sic utere tuo" principle. Under the easement theory of the civil law, the lower landowner must maintain a servitude for purposes of receiving through natural runways thereupon the natural surface waters of the paramount estate. It is time in this state, for this court to state

the law applicable and adapted to the conditions existent in this agricultural state.

In several cases, this court, pursuant to the construction given the facts presented, has not applied either the so-termed enemy rule or the civil law rule. Carroll v. Rye Tp., 13 N. D. 458, 101 N. W. 894; Davenport Tp. v. Leonard Tp., 22 N. D. 152, 133 N. W. 56; Soules v. N. P., supra; Reichert v. N. P., supra; Boulger v. N. P., supra; Froemke v. Parker, supra. See McHenry County v. Brady, 37 N. D. 59, 163 N. W. 540.

Our sister state, South Dakota, has recognized the application of the civil law rule. Quinn v. Railway Co., 23 S. D. 126, 120 N. W. 884, 22 L. R. A. (N. S.) 789. Thompson v. Andrews, 39 S. D. 477, 165 N. W. 9. In North Dakota, however, there is no legislative recognition, either expressly or impliedly, of the easement theory such as the statute of South Dakota quoted in the opinion of Thompson v. Andrews. Our statute simply expressly provides that one may not prevent the natural flow of the stream or of the natural spring from which it commenced its definite course, nor pursue nor pollute the same. § 5341, C. L. 1913. This refers to water courses which are specifically defined by statute. § 5341a, C. L. 1913. It might perhaps be inferred, through statements made in the cases of Soules v. N. P. and Reichert v. N. P., that this court has rather leaned towards the easement theory, although express statements are made in such opinions that neither the enemy rule nor the easement rule was applied. It must be evident that, in an action which involves the disposition or removal of surface waters, not through or by means of a water course, one theory or other of the law must be considered, unless, under either theory, the rule of law, as applied to the facts, remains the same. Much may be stated, perhaps, in favor of the justice of the easement theory and its application solely to agricultural territory in its ordinary agricultural development, but it must be recognized that this easement theory imposes a servitude upon lands which is classed and termed as a property right, and grants absolutely to the upper landowner the right to discharge waters as a property right over the servient tenement. This theory grants an absolute right; the enemy rule imposes a duty and the exercise of care. In this state, where the probelms of drainage require increased burdens upon lower lands, where the problems of reclamation and even or irrigation require increased artificial conditions for the development of our agricultural territory, and where,

furthermore, the development and growth of towns and cities in proximity to lands, either rural or urban, create artificial conditions imposing additional burdens on lower lands in addition to surface waters, the justice of the rule granting an absolute property right in the land of a servient tenement is, in fact, made negative.

The purpose of our statute requiring publicity of title, of easements, and incumbrances thereon do not voice themselves favorably to a rule of property that grants to one paramount landowner a property right in the land of another which is covert and unknown in its extent and character. In this state the fundamental conceptions of the common-law jurisprudence obtain except as constitutional, statutory, or local laws express to the contrary. The rejection of the easement theory which permits a landowner to make fruitful and productive, for purposes of his ownership, land that he would be compelled otherwise to maintain as a servitude for purposes of a drainway, subject only to the principle of law that he must not be negligent in so doing so as to thereby occasion damage to an upper riparian owner, fully performs the office of protecting both lower and upper land proprietors. Such noneasement theory is consonant with common-law principles. In other words, the measure of a landowner's right and reciprocating duty in the removal or disposition of surface waters is to be guided by the principle of law that he has the right to possess, use, and enjoy his land subject to the principle, "sic utere tuo ut alienum non lædas"; that in the application of this principle it may be an act of negligence for the lower landowner to obstruct a natural drainway through artificial obstructions so as to dam up or inhibit the natural passage of surface waters that theretofore flowed, and which he might have reasonably anticipated would continue to flow. What constitutes acts of negligence in the violation of this principle, "sic utere tuo," has been considered in many cases, and requires no present discussion. Upon this principle of law, the decisions in Soules v. N. P. and Reichert v. N. P. can be upheld and sustained as acts of negligence upon the facts in the record of each respective case. Accordingly, in the case at bar, the gist of defendant's liability is its negligent acts, if any, imposing artificial conditions upon conditions of nature theretofore existing in its own land, whereby negligently it occasioned damages to adjacent landowners through the impounding of surface waters.

The gist of plaintiff's right to recover in this action is dependent upon the negligent action of the defendant in constructing and maintaining

an insufficient cast iron culvert under its right of way and a double concrete culvert connecting therewith in the street immediately in front of its property, so as to occasion negligent impounding of waters and flooding of adjacent property, and, further, that the storm which occurred on August 21, 1918, was one which might have been reasonably anticipated. Upon the facts in this record and as found by the jury we are of the opinion that this negligence is not established as a matter either of law or of fact. The jury found that the city culverts were of insufficient capacity. To what extent, if at all, this insufficient capacity of the city culvert operated to contribute to plaintiff's damage cannot be ascertained except as a question of fact to be determined by the jury. See Boulger v. N. P., 41 N. D. 316, 171 N. W. 634.

The jury found that this storm, which was the fundamental cause of the damage, was an unusual and extraordinary storm. The court charged the jury that to escape the duty to provide for a run-off as charged the burden of proof was upon the defendant to prove that the storm which occasioned this flood was unprecedented; that it could not have been reasonably anticipated; that unprecedented floods are floods of such unusual occurrence that they could not have been foreseen by men of ordinary experience and prudence; that ordinary floods are those the occurrence of which may be reasonably anticipated from the general experience of men residing in the region where such floods happen. In accordance with such instructions it may be fairly implied that the finding of the jury was that this was an unprecedented storm, a flood of unusual occurrence. Soules v. N. P., 34 N. D. 33, 157 N. W. 823, L. R. A. 1917A, 501. Manifestly the contributing factors in flood damage concerning surface waters where run-off drains are concerned are volume, velocity, and intensity of rainfall. Manifestly, again, the capacity of drain channels are not determined alone by cross-sectional areas. The capacity of a run-off channel also requires the consideration of the velocity of the water therein in connection with other elements, as well as the cross-sectional area. We are satisfied upon the principles of law stated and upon the facts appearing in this record that there are questions of fact to be submitted to a jury concerning defendant's exercise of care, in constructing the cast iron culvert under, and the embankment along, the right of way, and in constructing the double concrete culvert in the street, all in connection with its care and duty involved and to be anticipated to take care of the surface waters from the drainage area concerned in accordance with the

purposes for which these artificial creations were constructed. In this connection it is to be observed, measuring the duty and liability of the defendant, that the drainage area itself has been subjected to artificial conditions in the erection of numerous buildings and in the creation of streets and avenues which add or detract from run-off conditions as they may have existed in a state of nature.

In our opinion the judgment should be reversed, and a new trial granted.

ROBINSON, C. J., concurs.

CHRISTIANSON, J., (concurring specially). I concur in the reversal of the judgment. And I agree with Mr. Justice BRONSON that—

This action "is essentially one concerning the disposition and removal of surface waters and for damages by reason of failure to properly provide for methods of disposition and removal."

I also agree with him that the evidence in this case does not establish that the so-called drainway involved here is a water course, and that such evidence, construed most favorably to the plaintiff, merely shows that the so-called drainway or run-off channel as it existed in its natural state "served simply the purpose of carrying off surface waters from the drainage area involved herein as it then existed in a state of nature." I also agree that the liability of the defendant in this case, if any, is not determinable by the application of the so-called civil law rule.

As pointed out in the opinion prepared by Mr. Justice BRONSON, much litigation has come before this court concerning the same drainage area and drainway which are involved here. An examination of the decisions in the various cases will disclose that they were all brought and tried on the theory that the defendant had been guilty of negligence; i. e., they were brought and tried on theory that in order to recover the plaintiff must establish that his loss had been caused by the negligence of the defendant. In my dissenting opinion in Reichert v. N. P. R. Co., 39 N. D. 114, 150, 167 N. W. 127, 139, I stated that I had concurred in the opinion, affirming a verdict against the railway company, in Soules v. N. P. R. Co., 34 N. D. 7, 157 N. W. 823, L. R. A. 1917A, 501, for the reason that—

"I believed that under the evidence in that case it was for the jury to say whether the defendant was negligent in constructing its culvert;

whether the flooding of the premises involved in that case was occasioned by the inadequacy of such culvert; and also whether the storm was of an unusual and unprecedented character." · See 39 N. D. 150, 167 N. W. 139.

I have grave doubts if there is any liability on the part of the defendant in this case. It seems to·me rather that the undisputed evidence establishes a state of facts similar to that which the jury found to exist in Boulger v. N. P. Ry. Co., 41 N. D. 316, 171 N. W. 632, and which I described in my dissenting opinion in Reichert v. N. P. Ry. Co., supra. I agree with Mr. Justice Bronson, however, that there must in any event be a new trial for the reasons assigned in § 6 of the syllabus. I believe, also, that the trial court committed prejudicial error in its instructions. The·defendant placed upon the witness stand certain civil engineers whose qualifications were unquestioned. They testified regarding the adequacy of the culverts constructed by the defendant. This was the only expert testimony adduced by either party in the case. In its instructions the trial court said:

"Now, in this case, gentlemen, you have heard experts give testimony hour after hour. The court instructs you that testimony has been given by certain witnesses who in law are termed experts, and in this connection I would suggest to you that, while in an action such as the one being tried the law receives the evidence of men expert in certain lines, and as their opinion derived from their knowledge of particular matters, the ultimate weight which is to be given to the testimony of expert witnesses is a question to be determined by the jury, and there is no rule of law which requires you to surrender your own judgment to that of any person testifying as an expert witness or to give controlling effect to the opinion of scientific witnesses. In other words, the testimony of an expert, like that of any other witness, is to be received by you, and given such weight as you think it is properly entitled to, but you are not bound by the testimony of any witness, expert or other. The court instructs the jury that, before the opinion of an expert has any value, the jury must first find to be true the fact upon which such opinion is based."

The testimony of these civil engineers was highly important to the defendant. It related to the basic point in controversy, the adequacy of the culverts. According to the testimony of these experts, the culverts were wholly adequate, the defendant was not guilty of negligence, and the injury could not have been occasioned by any act of the defendant.

It seems to me that the whole tenor of the instruction was derogatory to the testimony of these engineers, and must have had a tendency to discredit it before the jury.

GRACE, J. (dissenting). This action is one to recover damages in the sum of $3,000, with interest at 6 per cent, from August 24, 1918, on account of the flooding of a certain basement, by a certain rainstorm which occurred at Dickinson, N. D., August 21, 1918. Such flooding, it is claimed, was caused by the blocking or obstruction of a certain channel of drainage, in the city of Dickinson, by a certain embankment of earth, which crosses the channel, upon which embankment the railway is constructed. Through the embankment, over and across the channel, there is no outlet, excepting a small iron culvert. In short, it is claimed that the embankment across the channel completely blocks it, with the exception of the small culvert. The opening or diameter of the culvert is claimed to be about 4 feet.

Damage in the sum of $100 is claimed for removing water from the basement; $150 for damage to certain furniture, damage for the loss of rental value of the basement to the extent of $50 per month, from August 24, 1918, to the date of bringing the action, aggregating $825, and damage to plaintiff's stock of merchandise in the sum of $2,100.

Defendant, after admitting the appointment of McAdoo and his successsor, Hines, as Director General of Railroads, enters a general denial to the allegations of the complaint. The defendant further alleges that the damage and injury suffered by the plaintiff were occasioned and caused by an unusual and extraordinary rainstorm and flood, which occurred in the city of Dickinson and vicinity on or about the 21st day of August, 1918, and that said damage was in no manner caused through any negligence on the part of defendant.

The case was tried to the court and a jury at Dickinson. The verdict was in favor of the plaintiff for $2,554.24, including costs and interest, and judgment was entered for that amount. The issues of fact were submitted to the jury generally, except special questions were as well submitted. The special questions, which are material for consideration here, and which the defendant has in its brief set forth, are as follows:

Question 1: Was the rainstorm of August 21, 1918, involved in this action, an unusual and extraordinary rainstorm? Answer: Yes.

Question 2: Was the 4-foot cast iron culvert maintained by the de-

fendant of sufficient size and capacity to take care of the storm waters which might reasonably be expected in this locality? Answer: No.

Question 3: Was the double box concrete culvert running east and west, north of the Dickinson Grocery Company building, of sufficient size and capacity to take care of the storm waters which might reasonably be expected in this locality? Answer: No.

Question 4: Was the city culvert crossing Villard street on Second Avenue East at the intersection of Villard street and Second Avenue East of sufficient size and capacity to take care of storm waters which might reasonably be expected in this locality? Answer: No.

Question 5: If you return a verdict for the plaintiff and award him damages for loss of use of basement, how much have you allowed in such verdict for such damages for loss of use of basement? Answer: $165; interest, $5.28.                    Fred Dohrmann, Foreman.

Subsequent to the entry of judgment, a motion by defendant was made to vacate the judgment entered on the general verdict, and to grant judgment in his favor on the special questions returned by the jury. The motion was heard on August 16, 1920, and by the court denied.

The defendant makes assignment of eight errors, and two specifications of error as to the insufficiency of the evidence to sustain the verdict and judgment. The first five errors assigned relate to alleged errors of the court in its charge to the jury, and they may be considered in the order of their assignment. They are as follows:

"(1) Now, gentlemen, as sworn jurors, it is your duty in this case, as in any other case where an individual is on the one side and a corporation on the other, that you will not allow yourselves to be biased either for or against the corporation, or for or against the individual involved."

Of course, the railroad company was not a party to the action. The action, in fact, was against the government of the United States, though nominally, it was against the Director General. He, however, as is well known, acted for the government during the period of government control of the railroads. If there were any error in the giving of the instruction, it was error without prejudice.

"(2) If you find in favor of the plaintiff, and find that, following the flood of August 21, 1918, the plaintiff suffered damage because he was unable to use his basement, by reason of the same being threatened by recurrence of flood, and find that the plaintiff had reasonable ground to apprehend a flood, and that he was in fact in danger of a reflooding

of said premises, by reason of the defendant not furnishing adequate provisions for the run-off of waters through such drainage channel, then you may allow the plaintiff damages for the loss of the use of said basement during such time as you find that plaintiff was deprived of the full use of said basement. In no event, however, would plaintiff be entitled to recover damages for the use of the basement for a longer period than between the date of August 21, 1918, and the date of the summons in this action, to wit, January 7, 1920, or a greater sum than $30 per month, and if you find the plaintiff is entitled to damages for the loss of his basement, under these instructions you will find the reasonable rental value of said basement, and you will also find the reasonable value of the use and occupation of said basement, and you will take the smaller of these findings and deduct from the sum the value of the use and occupation actually made of said basement, and the difference will be the damages to which the plaintiff is entitled for the loss of the use of said basement."

The defendant does not seriously argue that the giving of that instruction is error, and we hold there was no error in the giving of it. There was competent evidence of actual damages suffered by plaintiff, other than that which he suffered by the loss of the use of the basement, which were about equal in amount to that stated in the verdict.

"(3) Now, in this case, gentlemen, you have heard experts give testimony hour after hour. The court instructs you that testimony has been given by certain witnesses who in law are termed experts, and in this connection I would suggest to you that, while in an action such as the one being tried the law receives the evidence of men expert in certain lines, and as their opinion derived from their knowledge of particular matters, the ultimate weight which is to be given to the testimony of expert witnesses is a question to be determined by the jury, and there is no rule of law which requires you to surrender your own judgment to that of any person testifying as an expert witness, or to give controlling effect to the opinion of scientific witnesses. In other words, the testimony of an expert, like that of any other witness, is to be received by you and given such weight as you think it is properly entitled to, but you are not bound by the testimony of any witness, expert or other. The court instructs the jury that, before the opinion of an expert has any value, the jury must first find to be true the fact upon which such opinion is based."

There was no error in giving this instruction. It was merely explana-

tory of the nature of expert testimony. By the instruction the weight to be given to the testimony was left entirely with the jury.

"(4) The Director General of Railroads in maintaining and continuing to keep the grades and embankments of railways under his control is chargeable with the same duty to provide for the run off of waters through the natural channels of drainage through such grades and embankments the same as though the said grades and embankments were under the control of a private individual or a railway company."

There was no error in giving this instruction. It merely informed the jury that, as a matter of law, the Director General of Railroads, or, in other words, the United States government, when it took over the operation of the railways, assumed the duty to provide for the run off of water through natural channels of drainage, through grades and embankments such as those under consideration, to the same degree as if the railways were under the control of an individual or the railway company.

"(5) It was the duty of the defendant to provide for the run off and escape of waters, not only from the usual and ordinary rains, but also from such extraordinary rains as might reasonably be expected to occur in this section of the country."

The giving of this instruction is most emphatically claimed by the defendant to constitute error. The third paragraph of the answer is as follows:

"Defendant alleges the fact to be that the damage and injury suffered by this plaintiff was occasioned and caused by an unusual and unprecedented storm and flood, which occurred in the city of Dickinson and vicinity on or about the 24th day of August, 1918, and said damage was in no manner caused through any negligence on the part of this defendant."

By this the defendant sought to interpose the defense of vis major. In other words, the defendant attempts to plead that the damages alleged were not occasioned by his negligence, but were due entirely to an act of God. It would appear, however, on full consideration of this alleged defense, that it is not so extensive or complete as to in reality set forth that character of defense. A storm might be unusual and extraordinary, but the existence of those facts would not alone be sufficient to relieve the defendant from liability. The evidence clearly shows the storm was not unprecedented, as there were many rainstorms in the vicinity of Dickin-

son in many preceding years, which were more than equal, in the amount of water precipitated, to the storm in question.

In addition to showing that the storm was unusual and extraordinary, it should be made to appear by the pleading and the proof, and at least by the proof, that the storm was of such unusual and extraordinary character that it could not have been reasonably anticipated. Or, in other words, that it could not be expected that such a rainstorm would occur in that vicinity. The defendant has not pleaded this latter element, and has not offered proof to establish it.

In the case of Reichert v. Northern Pacific Ry. Co., 39 N. D. 114, 167 N. W. 127, in an able opinion written by then Chief Justice Bruce, the following language is used:

"The question, to our mind, is one of notice and warning, more than it is of an unusual or extraordinary storm. And although the point is a close one, we do not feel justified in interfering with and overruling the finding of the jury in this respect. * * *

"We must, indeed, hold to what we believe to be the prevailing American rule, that the defense in such cases can only be that of vis major, or the act of God, and that the act of God in its legal sense applies only to events in nature so extraordinary that the history of the climatic variations and other conditions in the particular locality affords no reasonable warning of them, and that damages cannot be avoided on the grounds that the flood was an act of God, where, from geographical and climatic conditions, the flood might have been anticipated, though it occurred infrequently."

We think there was no error in the instruction, as it merely defined to the jury the legal duty of the defendant to provide for the escape of waters from usual and ordinary rains, but as well from extraordinary rains, where they were such as might reasonably be expected to occur in that vicinity.

Mr. Moomaw, superintendent of the State Experiment Farm at Dickinson, produced his records and showed that, in the years from 1907 to 1918, both inclusive, there were nine different rainstorms, which in amount of precipitation equaled or exceeded the one under consideration.

Witness Soules, who has owned the premises in question or a part of them, since 1907, testifies as to the flooding of the premises in the years 1907, 1909, and 1912.

The evidence is sufficient to show, as we view it, that rainstorms, resulting in precipitation equal to or exceeding the one in question, have occurred annually or biennially since 1907, in this vicinity.

This is of such frequency as to impose a duty upon those who have constructed, or who may construct, an embankment across this natural drainway in this vicinity, to anticipate this character of rainstorms as they reasonably may be expected to occur in the vicinity in question, with reasonable regularity, either annually, biennially, or perhaps more often. Though such storms may be unusual and extraordinary, it cannot be said that they should not be anticipated and provision made for taking care of the surplus water precipitated by them, where they occurred with such regularity, and covering such an extensive period, as the evidence in this case shows.

This conclusion leads us to the consideration of the contention of the plaintiff, which is to the effect that the plaintiff cannot recover, by reason of inconsistencies between the special questions and the general verdict. The contention is pressed with much earnestness as to the first question supra.

It will be observed that the answer to that question determines that the rainstorm was an unusual and extraordinary one. But that question, nor no other question, determines that it was not such a rainstorm as should have been anticipated.

It must be presumed that the last instruction, above mentioned, was followed by the jury. It returned a verdict in favor of plaintiff, and therefore determined that the defendant should have anticipated the storm in question, or otherwise it would have found in defendant's favor instead of against him.

It may be perfectly true that the storm was unusual and extraordinary, as the jury have said it was in their answer to question 1, and yet the defendant be just as liable in damages as if the storm had been an usual and ordinary one, if it were the duty of the defendant, under all the evidence in this case, to anticipate the character of the rainstorm, and the jury, in following the instructions of the court in this regard, have said by the general verdict that such was the duty of the defendant.

We, therefore, are of the opinion that there is no inconsistency between question 1 and the general verdict. On rehearing in Reichert v. Northern Pacific Ry. Co., supra, this court said:

"It is also the established law that surface waters, having an accus-

tomed flow in a drainage channel or waterway having well-defined banks, may not be stopped by an embankment across the channel so as to divert the waters to the injury of adjoining proprietors. See 40 Cyc. 648; Aldritt v. Fleischauer, 74 Neb. 66, 103 N. W. 1084, 70 L. R. A. 301. It seems to be well established also—and this even where the common-law rule applies—that where a  railroad crosses a ravine, gully, or natural depression in the earth, which forms the natural and accustomed channel for the escape of surface waters, it is incumbent upon the company to make provision for the flowage of the same. See Jungblum v. Minn., etc., Railroad Co., 70 Minn. 153, 72 N. W. 971; Smith v. Chicago Railroad Co., 83 Neb. 387, 119 N. W. 669; Quinn v. Chicago,, etc., Railroad Co., 23 S. D. 126, 120 N. W. 884, 22 L. R. A. (N. S.) 789; 40 Cyc. 644. The controversy in the case at bar has been mainly over the question of the size of the culvert," etc.

The language of the above quotation is applicable to this case, and here, as there, one of the principal elements of contention is the sufficient size and capacity of the same culvert, as will be seen by an examination of question 2, supra, to which the jury answered in the negative, thus determining that the culvert was of insufficient size and capacity to take care of the storm waters which might reasonably be expected in the vicinity of Dickinson.

From the evidence in this case, and from taking judicial notice of our former decisions in Reichert v. Northern Pacific Ry. Co., supra, Soules v. Northern Pacific Ry. Co., 34 N. D. 7, 157 N. W. 823, L. R. A. 1917A, 501, and Boulger v. Northern Pacific Ry. Co., 41 N. D. 316, 171 N. W. 632, it is clear there is a natural drainway or channel near Villard street and Second Avenue East, and extending thence south and east to the Heart river, a distance of about 700 feet; and that in that distance there is a fall in the channel toward the Heart river of between 30 and 40 feet.

It would seem clear, from the·size and nature of this channel, and the amount of lowland lying south and east from the intersection of Villard street and Second Avenue East, that the channel, if unobstructed by the railway embankment and the Dickinson Grocery building, etc., would be of sufficient capacity to carry to the Heart river all surface drainage waters within the drainage district of 168 acres here under consideration, and which would naturally empty, if unobstructed, into it, and in such manner and with such rapidity that the water would not back up and cause damage to property of the character alleged and proven in this action;

and this, we think, would be true even though the rainstorm were unusual and extraordinary.

In this connection, it is also to be observed that the evidence shows that, when the Dickinson Grocery Company building was constructed, the old open ditch which formerly led from near the intersection of Villard street and Second Avenue East was closed. In other words, that building was constructed over part of the old ditch. In its stead, the railroad company constructed two culverts which extend directly east on the south side of Villard street from the intersection of it, with Second Avenue East, approximately 185 feet, where they make an almost right angle turn, due south, for 5 feet, where they empty into a new artificially constructed open ditch, which conveys the water to the iron culvert.

The defendant further denies liability, on the theory that the primary and proximate cause of the flooding and the backing up of the water, which plaintiff claims was the direct cause of his damage, was the inadequacy of the city culverts extending north and south through Villard street, to receive and convey through them the water which naturally drained in that direction, and which necessarily would have to pass through them.

The defendant further maintains that the culverts on the right of way, extending east and west, were of sufficient capacity to take care of 3 inches of rain on the basin of 168 acres which constituted the drainage district, if it came down in a few minutes. If that contention is true, then, certainly, the city culverts should take care of an inch and a half of rain which fell in not less than 40 minutes, and perhaps the time was longer. It also may be noticed that the combined cross-section area of the city culverts on Villard street is 19 square feet. The combined cross-section area of the railroad culverts on Villard street is 24 square feet But in this connection it may also be noticed that the cross-section area of the iron culvert is only a fraction over $12\frac{1}{2}$ feet, as it was in form circular, and its diameter is 4 feet. And this calculation does not deduct from the diameter of the iron culvert for the 4 inches of cement that was on the bottom thereof at its entrance.

It would seem impossible, therefore, for the iron culvert to receive and convey the body of water issuing from either the twin culverts on the railroad right of way, or twin culverts of the city in Villard street, if water were flowing through them to their full capacity.

The evidence, we think, fairly shows that the high-water mark above

the iron culvert was 4 inches or more. If this be true, and, considering further that the land in that vicinity was low, there must have been quite a body of water spread around, and extending back to the railroad's twin culverts. Otherwise the water would not have risen above the iron culvert. If this be true this condition would, no doubt, have considerable tendency to retard the issuing of water from the railroad twin culverts. The fact that the water did rise above the iron culvert would show that it was not of sufficient capacity to take away the water, or otherwise it would not have risen above it.

It seems clear that, when the iron culvert was running full, and the water had risen above it, the tendency of the whole situation would be to hold back all water coming from towards the city of Dickinson; in other words, to retard its flow toward the iron culvert.

The defendant claims that, notwithstanding the water was 4 or 4½ inches above the iron culvert, it still was 6 inches lower than the floor of Henderson's store, at the front thereof; and that for this reason the water could not have backed up, or have been retarded, so that it would overflow and go into the basement of his store.

But, as against this, there is positive testimony of Henderson that he was at his store at the time of the rainstorm, and saw the water back up from the east, and he describes how eventually it poured into his basement, flowing over the angle irons and breaking in windows, filling his basement in a very few minutes. He was in the basement at the time, and took the freight elevator to the next floor, and according to the tenor of his testimony the water followed the elevator right up, and covered the first floor to the depth of several inches.

All of this evidence, as well as the evidence of all the facts, was for the jury. They have found favorably for plaintiff. The defendant challenges the sufficiency of the evidence to justify the verdict, on the theory that the testimony shows the loss in question was occasioned and caused by an unusual and extraordinary storm and flood, and that for the same reason, it is insufficient to sustain the judgment. What we have above said with reference to the character of the rainstorm, and the duty of the defendant to anticipate it, is a sufficient answer to these specifications.

It may be claimed that the damages are to some degree speculative, in that part of the plaintiff's claim is for loss of use of the basement, he not using it because he was afraid to do so for fear of a recurrence of

rainstorms which would inflict damages of a similar nature as those he had sustained. We think there is no merit in such claim in this case, as the evidence shows the actual damages sustained to the merchandise and property of the plaintiff, and the time and money spent in cleaning up the basement and store after the storm, together with interest thereon and costs, approximately equals the judgment recovered.

There is no inconsistency between question 4 and the general verdict. The evidence, as a whole, as we view it, clearly shows that the embankment constructed and maintained across the channel, the natural water drainway, and the inefficiency by the iron culvert to convey, with sufficient rapidity, the water precipitated by the rainstorm here under consideration, were the proximate cause of the damages sustained by the plaintiff.

It would appear that this particular iron culvert has been the source of considerable litigation, as is evidenced from the cases above cited, and which deal with damages claimed to have arisen from that source. It would seem, so far as we are able to determine, that there was no litigation, with reference to damages resulting from overflowing or banking up of waters in this particular channel while the bridge described in the evidence was across that channel at or near where the iron culvert is now located, which bridge was in length some 45 feet on top and from 16 to 20 feet underneath, and of sufficient height so that one on horseback could ride under it.

The origin of the litigation seems to be coeval with the installing of the iron culvert. The continued maintenance of the culvert in its present condition, and in view of prior litigation, it would seem, is fast approaching the nature of a nuisance.

From an examination of the weather reports, showing the rainfall in the vicinity of Dickinson, it may be reasonably expected that a rainfall such as that of August 21, 1918, will occur most every year. Hence it is reasonable to anticipate there will be much more litigation in the future from the same source as this. This continued litigation, not only likely imposes loss on the property holders, or business men, or some of them, in the city of Dickinson—for, even though they finally succeed in being partly compensated in damages, litigation, as a rule, is both disagreeable and expensive—but as well imposes great expense on Stark county, and not the least result of all is to impose heavy losses on the railroad company,

or those operating it, all of which at least, it would appear is possible to avoid.

The railroad company or those who operate and control it, will not likely be excused, even though it may by its engineers show that the culvert it has constructed is theoretically sufficient to take care of water which it should anticipate would fall upon the drainage area here under consideration, if, in the face of such proof its culvert does not carry away the water, and it piles up above it to more than 4 inches, and, as in this case the evidence shows, backs into a basement such as the one under consideration, and where all culverts in question here are much larger capacity than it. In all such theoretical calculations, there is very likely one or more unforeseen elements not taken into the calculation. The situation may be somewhat similar to that where engineers figure the number of cubic feet to be heated in a house of a given size, and arrive at a conclusion that a boiler or furnace of a given size would be sufficient to heat that space. The theory is largely correct, but in practice and actual results derived it is largely a failure. To get results that are satisfactory, the boiler or furnace should have a capacity to heat perhaps twice that space.

BIRDZELL, J. (dissenting). I disagree with the majority opinion in the holding upon which the reversal is based to the effect that there is an inconsistency between the general verdict and the answer to the first special question. The general verdict must be assumed to be founded upon the evidence, and to be in accordance with the instructions of the court as to the law. The record shows that the court instructed the jury quite fully with reference to the duty of the defendant, and as to the circumstances which would excuse him from liability. The jury were specifically instructed that, if the storm were of such an unusual character that one could not reasonably have expected it to occur, they should find for the defendant. They were told that the defendant was bound to provide for such extraordinary rains as might reasonably be expected to occur. Under these instructions the jury could not render a verdict for the plaintiff unless they believe that the storm though unusual or extraordinary, was one which the defendant was bound to anticipate. There is nothing in the answer to the special question, as I read it, to negative the affirmative finding in the general verdict, for the answer to the question only indicates that the storm, in the judgment of the jury,

was of an unusual and extraordinary character, but not so unprecedented that the defendants were not bound to anticipate it.

While dissenting upon the ground above indicated, I deem it proper to say that in my judgment it is gravely doubtful whether the defendants were not prejudiced by the instruction of the trial court relating to the so-called expert testimony. On this account I am not prepared to say that the order of reversal and remand for a new trial is erroneous.